(No. 32190.—

JOSEPHINE JONES *et al.*, Appellants, *vs.* GENOA S. WASHINGTON, Appellee.

*Opinion filed May 22, 1952—Rehearing denied September 15, 1952.*

ELLIS & WESTBROOKS, RICHARD E. WESTBROOKS, and EDWARD M. BYRD, all of Chicago, for appellants.

GETER & GETER, of Chicago, for appellee.

Mr. CHIEF JUSTICE DAILY delivered the opinion of the court:

Josephine Jones and her daughters, Evelyn and Gertrude, instituted this suit on December 12, 1949, against Genoa S. Washington, in the circuit court of Cook County, to set aside three deeds severally made, by which they conveyed to Washington their interests in a hotel property in the city of Chicago. The complaint also asked for an accounting of the rents and profits during Washington's occupancy and management of the property and prayed that a lease made to Washington by Josephine and her husband, Junius, during the latter's lifetime, be declared void. The trial court entered a decree refusing to vacate the deeds, but did order that the lease be set aside and that plaintiffs be granted an accounting. Plaintiffs have appealed to this court from the first portion of the decree, while defendant, Washington, has filed a cross appeal to the latter portions.

Junius Jones, husband of Josephine, was the owner of the hotel property during the latter years of his lifetime and his widow and two daughters, suing here, inherited it at his death. Jones and the defendant, Washington, became associated in the practice of law in 1934. Jones suffered a paralytic stroke in June, 1936, and thereafter, until his death in June, 1939, was unable to carry on his law practice or manage his property. During his illness and after his death, Washington assumed control and management of the property herein involved. Sometime in 1938, prior to Jones's death, the Jones family moved into a new residence, and it is shown that the lease and utility services on the new home were taken in the name of Washington. The widow and daughters testified that in September, 1939, following Jones's death, Washington moved into the home and lived with the widow as her husband until June, 1944. Several witnesses corroborated their testimony. Washington denied the arrangement and

relationship and his testimony that he maintained his residence at the hotel was substantiated by his witnesses. Josephine further stated that during this time he promised to marry her on many occasions, which testimony was also claimed by Washington to be false.

In May, 1941, the daughter Gertrude made known to her mother that it was necessary for her to marry because of her physical condition and the two women discussed the attendant need for money. The mother consulted with Washington and as a result Gertrude was sent to the office of Sidney P. Brown, Washington's attorney. There, in the company of her mother, she signed a quitclaim deed to Washington for her one-third interest in the property and received the sum of $1300, paid partly in cash and the balance in furniture. Approximately a year later, in June, 1942, the daughter Evelyn desired to get married and needed money. After discussing the problem with her mother and Washington, she, too, was sent to Brown's office where she executed a warranty deed to Washington for her interest in the premises and received consideration of $1500. The mother was also present on this occasion. Seventeen months later, in November, 1943, Josephine advised Washington that she was in need of money to pay for a plastic surgery operation on one of her children and she was likewise sent to Brown's office where she signed a quitclaim deed conveying her one-third interest to Washington for the sum of $1350. The three deeds above described are those which plaintiffs now seek to set aside.

During the period from the death of Junius Jones until this suit was instituted, Washington paid Josephine the sum of $20 per week in cash in addition to paying the rent of her home and making some larger semiannual payments to her. Washington testified that the amounts described were in payment for Josephine's employment as public-relations officer for the hotel, but she denied ever having performed any work for the hotel or Washington.

The plaintiffs, as appellants in this court, contend that a fiduciary relation existed between Washington and themselves under the peculiar circumstances existing when, as they claim, a former law associate of their husband and father, stepped into the family in the same apparent relationship. The master to whom the cause was referred for hearing found that a fiduciary relationship did exist, growing out of the facts as he found them to be proved, that Washington did move into the home of Josephine and lived with her as her husband from 1939 to 1944. He also found that Washington was far superior to the widow and her daughters in education and talent and that the relations of the parties were at all times carried on in full confidence. A further finding was that, although plaintiffs had testified that they did not know they were signing deeds and thought only that they were receiving loans from defendant, attorney Brown testified that he had, at plaintiff's request, advised them as to the contents of the documents. The master's conclusion was that there was no misrepresentation or overreaching by the defendant in procuring the deeds and that they were given for a good and adequate consideration. The chancellor approved these findings, refused to set aside the deeds and confirmed title to the premises in the defendant, Washington.

While defendant does not admit it, we think it is apparent from the facts of this case that a fiduciary relationship did exist between the parties at the time the disputed deeds were executed. A fiduciary relationship has been held to exist in every case where, in fact, trust and confidence are reposed by one person in another who, as a result thereof, gains influence and superiority over the other. (*Bremer* v. *Bremer*, 411 Ill. 454; *Steinmetz* v. *Kern*, 375 Ill. 616.) Where the fiduciary relationship does not exist as a matter of law, the relationship must be proved by clear and conclusive evidence when claimed as a basis to establish a constructive trust. (*Galvin* v. *O'Neill*, 393 Ill.

475.) No analysis of the evidence recited is needed in this cause to show that the chancellor's finding that a fiduciary relationship existed is clearly and amply supported. The mere existence of a fiduciary relationship does not, of itself, however, give rise to a constructive trust, but there must, in fact, exist an abuse of the relationship. (*Stephenson* v. *Kulichek,* 410 Ill. 139.) Where the existence of a fiduciary relationship has been established, the law presumes that any transactions between the parties, by which the dominant party has profited, are fraudulent. The presumption is not conclusive, but may be rebutted by clear and convincing proof that the dominant party has exercised good faith and has not betrayed the confidence reposed in him. The burden is on the grantee or beneficiary of an instrument executed during the existence of the fiduciary relationship to show the fairness of the transaction, that it was equitable and just, and that it did not proceed from a betrayal of the relationship. (*Suchy* v. *Hajicek,* 364 Ill. 502; *Schueler* v. *Blomstrand,* 394 Ill. 600.) Factors important in determining whether a particular transaction is fair and just include a showing by the fiduciary (1) that he has made a free and frank disclosure of all the relevant information which he had; (2) that the consideration was adequate, and (3) that the principal had competent and independent advice before completing the transaction. *Masterson* v. *Wall,* 365 Ill. 102; *Zeigler* v. *Illinois Trust and Savings Bank,* 245 Ill. 180.

In the complaint filed in this cause, plaintiffs seem to rely largely on the charge that the deeds were secured by fraud and chicanery. By their contentions in this court, it appears that they rely largely on the charges that the fiduciary relationship was breached because of lack of consideration for the deeds, which they say is supported by a showing that the deeds were induced at times when the grantors were in a state of financial stress, because they were not given advice as to the value of the property, and

because the fiduciary-grantee benefited from the transactions. An examination of the evidence in the record leads us to the conclusion that the chancellor's findings of fact, adverse to plaintiffs on the issues raised, are not against the manifest weight of the evidence. While the deeds were executed at times when the plaintiffs felt that they were in need of money, it will be seen that approximately one year intervened between the first and second deeds and that seventeen months elapsed between the execution of the second and third deeds. On each occasion it appears that the plaintiffs were the moving parties. On the other hand, there is no evidence that defendant sought out the plaintiffs or induced the transfers to him. The long periods of time between the execution of each of the deeds, and the fact that the circumstances surrounding the execution of each deed stemmed from personal considerations of the plaintiffs over which defendant cannot be said to have had any control, are factors which demonstrate that he was not the aggressive or moving party in the transactions. Whether or not attorney Brown fully explained to each of the plaintiffs the content and effect of the instruments they were signing cannot be fully answered from this record, for the testimony in such respect is utterly irreconcilable. There is much, however, which lends greater support to the testimony of Brown, for it is admitted that he delivered sizeable amounts of money to each plaintiff, and the check delivered to Gertrude, at a time when her mother was present, contains an endorsement which leaves no doubt that the money represented by the check was for the sale of her interest in the hotel to Washington. While not conclusive, of course, the fact that plaintiffs did not bring this action until six years after the last deed was executed must be considered as some evidence that plaintiffs were cognizant of the true effect of their actions. This is especially true in view of the fact that after 1943 plaintiffs received no distribution of the rents of the building as such. It is

true that $20 weekly payments were thereafter paid to Josephine, but we believe that the regular payment of such a fixed amount is consistent with a belief that such sum was not in settlement for rents collected during such weekly periods. We think the manifest weight of the evidence amply demonstrates that the deeds resulted from the desires of the plaintiffs-grantors rather than from the exertion of any undue influence by defendant, and that they understood, and abided by, the effect of the documents they signed.

On the issue of the sufficiency of the consideration, the record discloses that defendant paid the plaintiffs a total of $4150 for their combined equities in the property at a time when the encumbrances thereon totalled in excess of $38,000. When the deed of May, 1941, was executed by Gertrude, the property was subject to the following encumbrances: First mortgage—$11,500; second mortgage—$6280; third mortgage—$5375; second mortgage interest—$2800; third mortgage interest—$4100; judgment lien against Junius and Josephine Jones—$6600; and unpaid taxes of $1909, making a total of $38,564. During the years 1942 and 1943 the encumbrances remained substantially the same except that the first mortgage had been reduced by payments of approximately $250 a month. An expert witness for plaintiffs placed a value of $35,000 on the property as of 1941, while two witnesses for defendant fixed the value during that year as being $18,000 and $20,000 respectively. The only other testimony in this regard was given by a brother of the decedent, who expressed an opinion that the property was worth $65,000. In the light of the evidence, it cannot be said that plaintiffs received inadequate consideration for their equities, or that the chancellor's finding that there was sufficient consideration is palpably against the manifest weight of the evidence. Considering the record in its entirety, we cannot say that the evidence is sufficient to establish a constructive trust,

and the trial court did not error in its refusal to set aside the deeds.

We now come to defendant's cross appeal from the portions of the decree which (1) ordered him to render an accounting to plaintiffs from the date they inherited the property until the date each executed her deed to defendant, and (2) ordered set aside the lease under which defendant claimed to be holding and managing the premises during such periods. There is no claim that defendant did not pay the rentals called for in the lease and if the chancellor was in error in setting it aside, no basis for an accounting would then exist.

The lease in question was executed on April 3, 1939, about two months before the death of Junius Jones. It leased the hotel premises to defendant from that date until April 2, 1954, and called for a rental of $100 a month payable to Junius and Josephine Jones. The lease bears the signatures of Josephine Jones and Genoa S. Washington, while the signature of Junius Jones was admittedly written on the lease by his wife Josephine and carries the notation "his X mark." Josephine testified that she had no authority to sign the name of Junius to the lease and that she signed in the manner indicated, at defendant's insistence. Defendant contends that he was not present when the lease was executed by Josephine Jones, that he had no knowledge of the manner of its execution, and that on the doctrine of "unclean hands" plaintiff is estopped to deny the validity of the lease which she now admits she had no authority to execute. The finding of the master, approved by the court, was that Junius Jones was mentally incompetent when the lease was executed and that he did not know that he was making a lease. The master concluded that the lease was null and void, that defendant had overreached in obtaining it, and that he was guilty of a breach of confidence under the fiduciary relation he bore to Jones at the time.

The pertinent evidence shows that title to the premises was in Junius Jones, alone, when the lease of April 3, 1939, was executed. He had suffered a paralytic stroke in 1936 and a second one March 26, 1939. His physician testified that he saw Junius on each day after the second stroke until his death, that Jones was bedridden and unconscious during all that time and was, in the opinion of the physician, incapable of understanding or transacting the execution of a written instrument. The doctor also testified that from the date of the first stroke Jones was incapable of speech, and that he would sit in his wheel chair and just stare. The defendant, Washington, who became associated with Junius Jones in the practice of law in 1934, and who assumed the control and management of Jones's property in 1936, testified in regard to the lease only that he had discussed it with Jones some time before the second stroke, during which conversation Jones was able to express his approval or disapproval by making "noises;" that he did not know that Jones had suffered a second stroke in March, 1939, and that he was not present when the lease of April 3, 1939, was executed.

The only conclusion which can be reached from the uncontradicted medical testimony is that Jones was mentally incapable of understanding or executing a lease on April 3, 1939. We think, too, from all the testimony on this point, that a strong presumption obtains that defendant was aware of the exact physical condition of his law and business associate. When we consider, along with the medical testimony, that defendant had professional knowledge of the requirements for a valid lease and its proper execution, we cannot say that he should be allowed to escape his duties as a fiduciary by a mere disclaimer that he was present when the lease was executed. We conclude that the trial court properly held that the lease was null and void and that it was a breach of confidence for defendant to accept the benefits from it. Since this is true, plaintiffs are

entitled to an accounting for the periods set forth in the trial court's decree.

On the cross appeal defendant has also objected to the order taxing the master's fees against the parties equally. The matter of assessing costs in a chancery cause is within the discretion of the chancellor. In view of the nature of his findings in this cause and their affirmance by this court, we conclude that there has been no abuse of discretion.

The decree of the circuit court of Cook County is affirmed in all respects.

*Decree affirmed.*