**Peter M. ROBERTS, Plaintiff-Appellant, Cross-Appellee,**

v.

**SEARS, ROEBUCK AND COMPANY, a corporation, Defendant-Appellee, Cross-Appellant.**

**Nos. 77–1354 and 77–1499.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 14, 1978.

Decided April 3, 1978.

Peter D. Kasdin, Burton Y. Weitzenfeld, Chicago, Ill., for Sears, Roebuck.

Louis G. Davidson, John B. Davidson, Robert B. Patterson, Chicago, Ill., for Roberts.

Before CASTLE, Senior Circuit Judge, SPRECHER and BAUER, Circuit Judges.

SPRECHER, Circuit Judge.

The major issues in this case are whether the district court properly declined to decide the validity of plaintiff's patent in a suit for fraud, breach of a confidential relationship and negligent misrepresentation in defendant's procurement of an assignment of plaintiff's patent rights and whether the district court properly concluded that plaintiff had elected his legal remedies and, therefore, was barred from seeking his equitable remedies of rescission and restitution.

I

This case involves the efforts of one of this nation's largest retail companies, Sears, Roebuck & Co. (Sears), to acquire through deceit the monetary benefits of an invention of a new type of socket wrench created by one of its sales clerks during his off-duty hours. That sales clerk, Peter M. Roberts (Plaintiff), initiated the unfortunate events that led to this appeal in 1963, when at the age of 18 he began work on a ratchet or socket wrench that would permit the easy removal of the sockets from the wrench. He, in fact, designed and constructed a prototype tool with a quick-release feature in it that succeeded in permitting its user to change sockets with one hand. Based on that prototype, plaintiff filed an application for a United States patent. In addition, since he was in the employ of Sears, a company that sold over a million wrenches per year, and since he had only a high school education and no business experience, he decided to show his invention to the manager of the Sears store in Gardner, Massachusetts where he worked. Plaintiff was persuaded to submit formally his invention as a suggestion to Sears. In May 1964, the prototype, along with a completed suggestion form, was sent to Sears' main office in Chicago, Illinois. Plaintiff, thereafter, left Sears' employ when his parents moved to Tennessee.

It was from this point on that Sears' conduct became the basis for the jury's determination that Sears appropriated the value of the plaintiff's invention by fraudulent means. Plaintiff's evidence proved that Sears took steps to ascertain the utility of the invention and that based on the information it acquired, Sears became convinced that the invention was in fact valuable. Sears had two sets of tests run on plaintiff's wrench by its custom manufacturer of wrenches, Moore Drop Forging Co. (Moore). The first test was conducted in

July 1964, and it proved that the wrench operated normally and that the quick-release feature did not substantially weaken the structure of the wrench. The second test, conducted in May 1965, showed that actual mechanics liked the quick-release feature. Moore reported the results of these tests to Sears.

Based presumably on these tests, and the expert opinion of its senior tool buyer, Arthur Griesbaum, Sears in March 1965, had Moore design a fine-tooth wrench with the quick-release feature built into it. In addition, at about the same time, Sears put in motion plans to incorporate the quick-release feature into then-existing wrench models that constituted 74.27 percent of all the wrenches Sears sold. Thus, by early 1965, it was clear to Sears that this invention was very useful and probably would be quite profitable.

Sears also received reports from Moore regarding the manufacturing cost of plaintiff's quick-release feature. In the initial prototype built by Moore, the cost was 44 cents per unit. By June of 1965, Sears had received a report indicating that the cost could be reduced to 20 cents per unit. Thus, early in 1965, Sears learned that the feature was relatively inexpensive to manufacture.

Sears also took pains to ascertain the patentability of the quick-release feature. In April 1965, it received outside patent counsel's advice that there was "some basis for limited patentability" (defendant's Exhibit 9). It had previously learned in February 1965 from plaintiff's lawyer, Charles Fay, that he believed the invention was patentable based on a limited search. In addition, Sears was informed in early May 1965, by plaintiff's lawyer that a patent had been issued to plaintiff.[1]

With all of this information either available or soon to be available, Sears contacted plaintiff in January 1965, and began negoti-ations regarding the purchase of rights to use plaintiff's invention. During these negotiations, conducted with plaintiff's attorney, Sears' lawyer, Leonard Schram, made various representations to plaintiff that serve as the essential basis for plaintiff's complaint. In April 1965, in a letter seeking merely a license, Schram first told plaintiff that the invention was not new and that the claims in any patent that would be permitted would be "quite limited" (plaintiff's Exhibit 34). Second, Schram told plaintiff that the cost of the quick-release feature would be 40–50 cents. Third, he told plaintiff the feature would sell only to the extent it would be promoted and thus $10,000 was all that the feature was worth. Finally, and perhaps most ironically, Schram wrote to plaintiff that "[o]nce we have paid off the royalty expense, then we would probably take the amount previously allocated to said expense and use it for promotional expenses *if we desire to maintain sales on the item.*" (Emphasis added).

Based on this letter, plaintiff entered into the agreement on July 29, 1965, which provided for a two cent royalty per unit up to a maximum of $10,000 to be paid in return for a complete *assignment* of all of plaintiff's rights. In fact, for no extra charge, plaintiff's attorney gave Sears all of plaintiff's foreign patent rights. A provision was included in the contract regarding what would happen if Sears failed to sell 50,000 wrenches in a given year, thus reinforcing the impression that the wrenches might not sell very well. Also, a provision was inserted dealing with the contingency that a patent might not be issued, notwithstanding that Sears already knew, and plaintiff did not, that the patent had been granted.

By July, Sears knew that it planned to sell several hundred thousand wrenches with a cost per item increase of only 20 cents, that a patent had issued and that this

---

1. We might note here that Mr. Fay contacted Sears before informing plaintiff that a patent had issued. In addition, it was shown that Sears had contacted Mr. Fay during the period of these negotiations about doing some work for it and that he, in fact, did perform a couple of routine matters for Sears, thus raising some doubt about the independence of his advice to plaintiff.

product in all likelihood would have tremendous appeal with mechanics. Nonetheless, it entered into this agreement both having failed to disclose vital information about the product's appeal and structural utility and having made representations to plaintiff that were either false at the time they were made or became false without disclosure prior to the time of the signing of the contract.

Within days after the signing of the contract, Sears was manufacturing 44,000 of plaintiff's wrenches per week—all with plaintiff's patent number prominently stamped on them—and within three months, Sears was marketing them as a tremendous breakthrough. Within *nine months*, Sears had sold over 500,000 wrenches and paid plaintiff his maximum royalty thereby acquiring all of plaintiff's rights. Between 1965 and 1975, Sears sold in excess of 19 million wrenches, many at a premium of one to two dollars profit because no competition was able to market a comparable product for several years. To say the least, plaintiff's invention has been a commercial success.

Plaintiff, a Tennessee resident, filed suit against Sears, an Illinois Corporation, in federal district court in December 1969, based on diversity jurisdiction, seeking alternatively return of the patent and restitution or damages for fraud, breach of a confidential relationship and negligent misrepresentation. A jury trial was held from December 20, 1976, until January 18, 1977. During the trial plaintiff basically proved the facts as presented above. Sears argued that it did not misrepresent any facts to plaintiff, that he had a lawyer and thus there was no confidential relationship and that the success of the wrenches was a function of advertising and the unforeseeable boom in do-it-yourself repairs, and thus

Sears did not misrepresent the salability of plaintiff's wrenches. The jury was instructed on each of the three counts in plaintiff's complaint and told that it could award plaintiff profits [2] for Counts I and II and could consider a reasonable royalty as a remedy for Count III. The jury apparently believed the plaintiff's evidence because it found Sears guilty on all three counts and entered judgment for one million dollars on each count, but the award was not cumulative.

Both parties filed post-trial motions. Sears filed for judgment NOV and plaintiff sought rescission of the contract and restitution. The district court denied both motions holding as to Sears' motion that the jury verdict was in accordance with the evidence and that the damages award was reasonable and holding as to plaintiff's motion that when he permitted the case to go to the jury he had elected his legal remedy and could not later also seek his equitable relief. Plaintiff appealed seeking equitable relief and Sears cross-appealed the one million dollar judgment against it. Since Sears' cross-appeal raises basic issues of liability, we will deal with it first. We will subsequently consider plaintiff's appeal on the issues of the appropriate remedy.

## II

■ Sears' primary argument in its cross-appeal is that the district court erred in not determining conclusively the validity of plaintiff's patent as a precondition to trying plaintiff's claims for fraud, breach of a confidential relationship and misrepresentation. Relying on *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), Sears contends that if the district court had concluded that the patent was invalid, then plaintiff could not have been injured by any fraud Sears may have com-

---

2. The court instructed the jury on damages for Counts I and II, fraud and breach of a confidential relationship, as follows:

The award of money damages you make may equal the net profits which you find the defendant gained as a result of its merchandising of wrenches incorporating Plaintiff's quick release invention and idea, minus any

expenditures which you find the defendant has proved it incurred which it would have incurred had it not merchandised such wrenches incorporating plaintiff's quick release invention and idea from the time of the contract in question to the present.
(Tr. at 3469).

mitted since it paid $10,000 for a "worthless" invention.

Sears' analysis, however, misconceives the Supreme Court's holding in *Lear*. There the Court held that a patent licensee was not estopped to contest the validity of the licensor's patent, and, in fact, was not required to pay the contractually-provided royalties for the license on the invalid patent during the pendency of the litigation. Contrary to Sears' implication, the *Lear* Court did not hold that the potentially invalid patent was worthless and thus the royalties offered in exchange for the right to use that patent would be unjustified. Instead, the Court explicitly recognized that there was significant economic value in the rights to an unchallenged patent. 395 U.S. at 669, 89 S.Ct. 1902. In this regard the Court stated that "the existence of an unchallenged patent may deter others from attempting to compete with the licensee," thereby creating a monopoly in fact if not in law. *Id.*[3]

Other courts have also acknowledged that significant economic value attaches to the rights to an uncontested patent. The Supreme Court recognized this recently in an opinion by Chief Justice Burger: "[E]ven though a discovery may not be patentable, that does not 'destroy the value of the discovery . . . .'" *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 482, 94 S.Ct. 1879, 1886, 40 L.Ed.2d 315 (1974). Similarly, this court has held that "[w]hile there are paradoxical aspects of allowing recovery to arise from illegal interference with the sale of something which ultimately was proven to have no sales value, it cannot be said that there was no such value during the period of the presumptive validity of the patent." *Moraine Products v. ICI America, Inc.*, 538 F.2d 134, 149 (7th Cir. 1976).[4]

The facts of this case, by themselves, make abundantly clear both that Sears believed that the uncontested patent had significant economic value as a deterrent to competitors and that the patent, in fact, did serve to deter competitors. Sears had the patent number stamped on all of its wrenches with plaintiff's quick-release feature, which presumably was done for the purpose of scaring off competitors. Also, Sears' competitors did not enter this lucrative market for several years after it became clear that this product had genuine sales appeal, which can only be explained by the existence of the patent.

It is at least somewhat disingenuous for Sears to argue before this court that plaintiff's patent was valueless when it made every effort in its marketing to exploit the economic value of the uncontested patent, received the benefits of a factual monopoly for several years because of that uncontested patent and to this day has refused to return the patent rights to plaintiff in return for the $10,000 originally paid to acquire these "valueless" rights. We, therefore, have little difficulty finding that Sears' deception caused plaintiff to be injured in fact.

The issue remains whether the public interest, recognized in *Lear,* in having patent validity challenged is of such significance that we should extend *Lear* to cover this case. The *Lear* Court held that a licensee should be permitted to contest the validity of a licensor's patent because "[l]icensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery." 395 U.S. at 670, 89 S.Ct. at 1911. Thus, the

---

**3.** This valuable benefit was available even in the case of a non-exclusive license because the royalty charged to the licensee "serves as a barrier to entry." 395 U.S. 669 n. 16, 89 S.Ct. 1910.

**4.** The court subsequently defined more specifically the nature of the economic value created by the uncontested patent during the period of its presumptive validity:

While Moraine was the holder of a presumptively valid patent, it could legally entertain the expectation, unless it had in some manner deprived itself thereof, of receiving royalties from licensing arrangements which in final analysis are agreements in which the licensee is purchasing the right to be free from infringement litigation, which Moraine did have to sell during the period of validity. 538 F.2d at 149.

Court feared that if licensees "are muzzled, the public may continually be required to pay tribute to would-be monopolists, without need or justification." *Id.*[5]

We believe that the reasoning in *Lear* does not extend to this case for two reasons. First, we deal here with a complete assignment of plaintiff's patent rights to Sears. *See generally Heltra, Inc. v. Richen-Gemco, Inc.*, 395 F.Supp. 346, 352 (D.S. C.1975), *rev'd on other grounds*, 540 F.2d 1235 (4th Cir. 1976); Arnold & Goldstein, *Life Under Lear*, 48 Texas L. Rev. 1235, 1244 (1970). Thus, the primary evil that the Court in *Lear* sought to end—that the public might have to pay tribute to a "would-be monopolist"—is completely irrelevant to this case. Plaintiff has no legal basis for exacting any "tribute" until the patent rights are returned to him. At that point in time, the patent's validity can be tested either in an infringement suit or after plaintiff enters into a licensing agreement. The public's interest would not be injured by our decision to bar Sears from contesting this patent at this time.

Second, and perhaps even more fundamentally, the Court's analysis in *Lear* initiated with an assessment of "the spirit of contract law, which seeks to balance the claims of promisor and promisee in accord with the requirements of *good faith.*" 395 U.S. at 670, 89 S.Ct. at 1911. (emphasis added). Only after the Court satisfied itself that the equities were balanced on each side did it proceed to a consideration of the needs of patent law and the public interest. Sears' actions in this matter have violated completely the basic assumption in *Lear* that there was good faith in the dealings between the parties. There is no balance of equities between Sears and plaintiff in their contractual relations. For this court to employ the public interest in patent law to

sanction Sears' conduct is unjustifiable. Certainly nothing in patent law requires this court to permit fraud to go unremedied. *Cf. Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 487, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974) (nothing in patent law discourages states from preventing industrial espionage). We, therefore, hold that the district court properly concluded that *Lear, Inc. v. Adkins*, is no bar to plaintiff's recovery.

## III

Having determined that the district court properly declined to decide the validity of the plaintiff's patent, we can readily dispose of Sears' second contention in its cross-appeal. Sears argues that the district court erred in not permitting the introduction of certain evidence dealing with the prior art surrounding plaintiff's invention. Sears, however, attempted to introduce all of the prior art evidence at issue (defendant's Exhibits 25, 26, 29, 33, 34, 39, 40, 41, 42 and 43) for the purpose of proving that the patent was invalid. Since that contention was irrelevant to the case, it seems, *a fortiori,* that the materials introduced to prove it must also be deemed irrelevant to this case.

Sears, however, argues that the district court recognized that patent validity was a relevant issue. By citing materials out of context, Sears has severely mischaracterized the district court's analysis. During the trial, the district court properly recognized that some evidence of prior art was relevant for the issue of Sears' intent. Prior art was relevant to the limited extent that if Sears could prove it knew about the prior art at the time it was negotiating with plaintiff then the jury might conclude that Sears had not intentionally deceived plaintiff about the novelty and value of his invention.

---

5. The policy against deterring licensees from attacking the validity of the licensor's patent also justified not requiring the licensee to pay royalties under the license agreement during the litigation. The Court reasoned:

Enforcing this contractual provision would give the licensor an additional economic incentive to devise every conceivable dilatory

tactic in an effort to postpone the day of final judicial reckoning. . . . [T]he cost of prosecuting slow-moving trial proceedings and defending an inevitable appeal might well deter many licensees from attempting to prove patent invalidity in the courts. 395 U.S. at 673, 89 S.Ct. at 1912.

The best example of this reasoning by the district court was with regard to the Carpenter patent (defendant's Exhibit 29). In considering its relevance the court asked when Sears had become aware of the patent. Counsel for Sears stated that the Carpenter patent was not discovered until 1971, after the law suit was initiated (Tr. at 2409). Since it was clear that the Carpenter patent had not entered into Sears' assessment of the value of plaintiff's invention when it made its representations to plaintiff, the district court properly concluded the patent was irrelevant and refused to admit it into evidence (Tr. at 2425). We have examined the record concerning the other prior art evidence that was not admitted and about which Sears complains, and we conclude that the district court properly applied its rule of limited relevance and thereby correctly excluded all of it.

## IV

■ Sears' final argument in its cross-appeal is that plaintiff failed to prove the existence of a confidential relationship between himself and Sears. In assessing that argument, we recognize at the outset that there are no hard and fast rules for determining whether a confidential relationship exists. *See* G. Bogert, The Law of Trusts and Trustees § 482 (2d ed. 1960). The trier of fact must examine all of the circumstances surrounding the relationship between the parties and determine whether "one person reposes trust and confidence in another who thereby gains a resulting influence and superiority over the first." *Kester v. Crilly,* 405 Ill. 425, 91 N.E.2d 419, 423 (1950).

Various factors have been recognized judicially as being of particular relevance to that inquiry. Among them are disparity of age, education and business experience between the parties. *Melish v. Vogel,* 35 Ill. App.3d 125, 343 N.E.2d 17, 26 (1975). Additional factors are the existence of an employment relationship and the exchange of confidential information from one party to the other. *See Yamins v. Zeitz,* 322 Mass.

268, 76 N.E.2d 769, 772 (1948). All five of those factors are present in this case. In addition, one of Sears' witnesses admitted that the company expected plaintiff to "believe" and to "rely" on various representations that Sears made to him (Tr. at 1981). Obviously, this question is best left to the trier of fact, and this court under any circumstances would hesitate to disturb the jury's findings. That hesitation is especially strong here where so many factors suggest that a confidential relationship in fact existed.

■ Sears argues, however, that there are two factors involved here that eliminate any possible confidential relationship. They are that plaintiff never proved that Sears had knowledge of the confidential relationship upon which plaintiff was relying and that plaintiff retained counsel to guide him, and therefore, did not rely on Sears. We find neither factor sufficient to justify overturning the jury's verdict on this issue.

■ Sears cites several cases that emphasize that a confidential relationship cannot be thrust upon an unknowing party. *See Broomfield v. Kosow,* 349 Mass. 749, 212 N.E.2d 556 (1965); *Yamins v. Zeitz, supra; Comstock v. Livingston,* 210 Mass. 581, 97 N.E. 106 (1912). That proposition, however, does not lead to the conclusion that a plaintiff must demonstrate by direct evidence that the defendant actually was aware of the confidential relationship. All that must be proved is that the parties engaged in activities under circumstances that created a confidential relationship and that defendant breached that relationship.

In the cases cited by Sears, all of the circumstances surrounding the transactions that were being attacked suggested an arms-length arrangement, and thus the plaintiffs in those cases attempted to thrust a confidential relationship on the unknowing defendants after the fact. Here, Sears' knowledge is circumstantially proved by all of the facts surrounding its dealings with plaintiff. In addition, as suggested above, there was direct testimony to the effect

that Sears expected plaintiff to rely on its representations.[6]

With regard to the existence of counsel representing plaintiff, we conclude that that is merely one factor to be considered along with all of the others. In fact, once plaintiff established the existence of a confidential relationship through proof of the five factors previously discussed, the burden was on Sears to prove that plaintiff had competent and independent advice. See Jones v. Washington, 412 Ill. 436, 107 N.E.2d 672, 674 (1952). The judge instructed the jury on this issue (Tr. at 3467) and it obviously rejected Sears' argument. There is no basis for this court to disturb that determination. Thus, we conclude that a jury could reasonably find that a confidential relationship existed between the parties and that Sears breached its duties created by that relationship.

For all of the above-stated reasons, we find no merit to any of the issues raised in Sears' cross-appeal. We, therefore, affirm the district court's judgment of liability against Sears on all three counts of plaintiff's complaint.

V

Plaintiff, in his appeal, seeks review of the district court's decision that he elected his legal remedies by taking the case to the jury, and therefore, is barred from pursuing his equitable remedies of rescission and restitution. Plaintiff argues that the district court, as a court of equity, should have accepted the jury's liability determination, but should have disregarded its damages verdict and instead should have granted rescission and restitution.[7]

Before considering the substance of the doctrine of election of remedies, we should determine what law, state or federal, should control our decision. Sears relies almost exclusively on Illinois decisions in arguing that after plaintiff takes his case to the jury in a court of law he cannot thereafter seek rescission of the contract from a court of equity. We, however, conclude that federal courts are not bound by the Illinois election of remedies doctrine.

The choice of law issue in diversity cases, where no Federal Rule of Civil Procedure clearly controls, is governed by the Rules of Decision Act, 28 U.S.C. § 1652.[8] See generally Redish & Phillips, Erie and the Rules of Decision Act: In Search of the Appropriate Dilemma, 91 Harv.L.Rev. 356, 357–58 (1977); Ely, The Irrepressible Myth of Erie, 87 Harv.L.Rev. 693, 697–700 (1974). In interpreting that Act, at least one circuit has recognized that where a state procedural rule is derived from a judicial system that is fundamentally inconsistent with the federal judicial system, then the state rule need not be slavishly adhered to by a federal district court. Atkins v. Schmutz Mfg. Co., 435 F.2d 527 (4th Cir. 1970), cert. denied, 402 U.S. 932, 91 S.Ct. 1526, 28 L.Ed.2d 867 (1971). See also Redish & Phillips, supra at 391 n. 189.

Under the Illinois cases cited by Sears, a plaintiff had to elect his remedies at the

---

6. Sears also argues that the district court failed to instruct the jury on the issue of Sears' knowledge of the confidential relationship. In view of our holding that knowledge does not have to be proved as an element of the tort, we find no basis for requiring any specific mention of this factor. In our view, the district court's instructions on the confidential relationship issue were proper.

7. Plaintiff asks this court to leave undisturbed his one million dollar judgment in Count III, negligent misrepresentation, because that is an action at law and therefore was properly given to and decided by the jury.

As to Counts I and II, plaintiff claims that the evidence proves that Sears' profits on the sale

of quick-release wrenches was in excess of 40 million dollars. Sears argues that that figure is based on a misinterpretation of Sears' sales techniques. Given our disposition of this case, we need not resolve this dispute, although we do agree with the district court that the jury's damage award was not unreasonable.

8. The Act provides:

The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the Courts of the United States, in cases where they apply.

28 U.S.C. § 1652.

time of filing suit because Illinois had retained separate courts of equity and courts of law. *See, e. g., Carr v. Arnold,* 239 Ill. 37, 87 N.E. 870 (1909). In federal courts, however, the distinction between law and equity has long been abolished. Fed.R. Civ.P. 2. It would be anomalous to follow a state rule created under a judicial system so at odds with that of the federal system. In fact, it might be argued that such a holding would violate Rule 2, in which case state law, of course, would be disregarded. *See Hanna v. Plumer,* 380 U.S. 460, 469–74, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). We, therefore, feel no compunction in declining to follow Illinois law on this issue.[9]

Having determined that the district court is not bound by the rigid requirements of Illinois law on election of remedies, there remains the question whether plaintiff can still pursue his equitable remedies under the facts of this case. We conclude that the district court correctly decided not to disturb the jury's monetary award, but that the court erred in not considering whether rescission of the contract and return of plaintiff's patent were appropriate.

■ The general rule as to when an election is necessary is that " 'a certain state of facts relied on as the basis of a certain remedy is inconsistent with, and repugnant to, another certain state of facts relied on as the basis of another remedy.' " *Prudential Oil Corp. v. Phillips Petroleum Co.,* 418 F.Supp. 254, 257 (S.D.N.Y.1975). Here, the jury was instructed that plaintiff could receive profits for Counts I and II,

fraud and breach of a confidential relationship.[10] Apparently dissatisfied with the size of the jury verdict, plaintiff sought in a post-trial motion to have the court reconsider the evidence and award relief based on essentially the same standard the jury used. To have granted plaintiff's request would have been completely unfair to Sears.[11] It might have been better for the court to require the plaintiff to elect his remedy expressly prior to instructing the jury, but plaintiff did not object to the court's procedure, and therefore, must have been satisfied to let the jury determine the appropriate award. Having let the case go to the jury without getting the issue clarified, plaintiff should not be heard to complain about the outcome of that procedure.

■ With regard to an election between the profits awarded by the jury and return of the patent based on rescission, however, we see no basis for invoking the election of remedies doctrine. Based on the jury instruction, plaintiff will receive one million dollars as the measure of *past* profits earned by Sears up to the time of trial. That award, however, is not inconsistent with return of the patent so that plaintiff can receive the *future* benefits of the patent that Sears fraudulently acquired. There will be neither a double recovery nor a factual inconsistency between these remedies. *See Prudential Oil Corp., supra* at 257; G. Bogert, The Law of Trusts and Trustees § 946 (2d ed. 1962). Therefore, we conclude that going to the jury under a past profits instruction did not bar plaintiff

9. This result accords with the approach recently suggested in Redish & Phillips, *supra.* The authors in that article suggest that the best approach to Rules of Decision Act cases is to examine the policy underlying the state rule to determine if it affects primary conduct, is intended to benefit one class of litigants over another or is merely the state's evaluation of the most efficient way to handle its docket. *Id.* at 394–96. The Illinois rule separating the courts would appear to fall within the third category. In such a situation, the authors conclude, "The federal diversity court should be permitted to adopt or reject such rules since, as noted previously, it retains some interest in regulating its own internal procedures." *Id.* at 395. We agree with that conclusion.

10. *See* note 2 *supra.*

11. The district court reasoned that such an approach would create the type of res judicata problems mentioned in our earlier decision in *Federal Savings & Loan Ins. Corp. v. American Nat'l Bank & Trust Co.,* 392 F.2d 906 (7th Cir. 1968). While we do not perceive any basis for a claim of res judicata or even a double recovery problem, we do believe it would have been unfair to disturb the jury's award, and, therefore, agree with the district court's decision not to do so.

from seeking rescission and thereby possibly recovering his patent. Whether rescission is appropriate, however, is an issue that should be decided in the first instance by the district court.

For the reasons stated above, we affirm the district court's judgment against Sears on all three counts in plaintiff's complaint and the court's decision not to alter plaintiff's monetary award, but reverse the court's determination that it lacked the power to award rescission and remand to the district court for a determination of whether rescission is appropriate under the facts of this case.

Affirmed in part; Reversed in part; and Remanded