Steven J. WICKENHAUSER and
Christy K. Wickenhauser,
Plaintiffs-Respondents-Petitioners,

v.

Jack LEHTINEN and Carolyn Lehtinen,
Defendants-Appellants,

Joseph NIELSEN and Sharon Nielsen,
Defendants.

Supreme Court

*No. 2004AP2681. Oral argument February 13, 2007.
—Decided June 29, 2007.*

2007 WI 82

(Also reported in 734 N.W.2d 855.)

41

For the plaintiffs-respondents there were briefs by *Timothy J. O'Brien* and *Bakke Norman, S.C.,* New Richmond, and oral argument by *Timothy J. O'Brien.*

For the defendants-appellants there was a brief by *Steven L. Miller* and *Miller & Miller,* River Falls, and oral argument by *Steven L. Miller.*

¶ 1. PATIENCE DRAKE ROGGENSACK, J. This is a review of an unpublished per curiam decision of the court of appeals that reversed the circuit court's judg-

ment[1] awarding Steven and Christy Wickenhauser (the Wickenhausers) compensatory and punitive damages and denying Jack Lehtinen's (Lehtinen) motions for summary judgment based on claim preclusion. The court of appeals reasoned that since the Wickenhausers obtained rescission of an option to purchase 300 acres of their property in a prior action, they were barred by the election of remedies doctrine from obtaining damages in this action. *Wickenhauser v. Lehtinen*, No. 2004AP2681, unpublished slip op., ¶ 1 (Wis. Ct. App. Jan. 10, 2006).

¶ 2. We conclude that the election of remedies doctrine does not bar the Wickenhausers from obtaining damages in this action because rescission of the option in the prior action is consistent with the subsequent award of damages. In addition, their claim in this action is not barred by claim preclusion, nor did the common-law compulsory counterclaim rule require the Wickenhausers to bring their claim for damages as a counterclaim in the first action. Furthermore, the fraud in the inducement exception to the economic loss doctrine is consistent with our holding. However, we do not address several alternative arguments raised by Lehtinen to the court of appeals because they were not brought before us for consideration. Accordingly, we reverse the court of appeals determination and remand to the court of appeals for further proceedings consistent with this opinion.

## I. BACKGROUND

¶ 3. The Wickenhausers and Wickenhauser Farms, Inc. own and operate a dairy farm outside of

---

[1] The Honorable Eric J. Lundell, Circuit Court Judge for St. Croix County, presided.

New Richmond, Wisconsin, in St. Croix County. The original farm parcel consists of 146 acres, the Wickenhausers' residence and buildings related to their farming operation. On August 29, 1997, the Wickenhausers purchased 300 additional acres from Thomas Burow (Burow). At that time, the Wickenhausers used Bison Financial's services in an attempt to secure additional financing to consolidate debt and fund the expansion of their farm operation. Bison Financial was not able to secure a financing package for the Wickenhausers, but it did introduce the Wickenhausers to Lehtinen, a retired dentist who frequently invested in real estate.

¶ 4. The Wickenhausers and Lehtinen entered into a series of transactions where Lehtinen loaned money or paid bills on the Wickenhausers' behalf. On September 10, 1997, the Wickenhausers borrowed $130,000 from Lehtinen, which was secured by a mortgage on the 300–acre parcel the Wickenhausers purchased from Burow. Another loan was made by Lehtinen in December 1997, when he provided $66,000 to the Wickenhausers, which also was secured by a mortgage on the 300–acre parcel.

¶ 5. Lehtinen presented the Wickenhausers with an option that he asked the Wickenhausers to sign, which gave Lehtinen a three-year right to purchase the entire 300–acre parcel for $300,000. Lehtinen contended that in exchange for the $66,000 loan, together with his promise to secure an additional loan of $200,000 from his friends Joseph and Sharon Nielsen (the Nielsens), the Wickenhausers agreed to make Lehtinen one-half owner of the 300–acre parcel. However, the Wickenhausers believed that Lehtinen wanted the option only to show the Nielsens that there was sufficient security for their loan and as protection for Lehtinen's loans, if the Wickenhausers defaulted or

49

went bankrupt. Lehtinen told the Wickenhausers that he would not record the option.

¶ 6. In November 2000, Lehtinen claimed he owned a one-half interest in the 300–acre parcel and asked the Wickenhausers to sign a quit claim deed conveying him that interest. The Wickenhausers refused. In December 2000, based on previous loans, Lehtinen attempted to exercise the option to purchase the entire 300–acre parcel, which he had recorded, but the Wickenhausers refused to convey the property. On March 28, 2001, Lehtinen filed an action against the Wickenhausers (the first action) wherein he sought enforcement of the option to purchase the 300–acre parcel.

¶ 7. The Wickenhausers filed an answer in the first action, asserting, as an affirmative defense, that Lehtinen fraudulently induced them to sign the option. The Wickenhausers did not counterclaim for damages in the first action. On April 16, 2001, the Wickenhausers commenced this action, seeking to quiet title to the 300–acre parcel in their names and damages arising from the fraudulent misrepresentations Lehtinen made to induce them to sign the option.

¶ 8. On June 11, 2001, the Wickenhausers moved to consolidate the actions, but their motion was denied. On July 27, the Wickenhausers filed an amended answer in the first action providing more detail about the fraud allegations, but they did not counterclaim for damages.

¶ 9. After testimony had concluded in the first action, the court asked the parties to submit proposed findings of fact, conclusions of law and judgments. In September 2001, the court adopted the Wickenhausers' document without modification. The court found that the Wickenhausers did not agree to grant Lehtinen an

ownership interest in the 300–acre parcel. The judgment also rescinded the option for these reasons: (1) it was void for lack of consideration; (2) Lehtinen made material misrepresentations to the Wickenhausers and the Wickenhausers reasonably relied on the misrepresentations to their detriment; and (3) Lehtinen was acting as a dual agent at the time he induced the Wickenhausers to sign the option.

¶ 10. In this action, the Wickenhausers moved to apply issue preclusion to Lehtinen's defenses to their allegations of misrepresentation and liability, asserting that Lehtinen's misrepresentation had been decided in their favor in the first action; and therefore, Lehtinen could not deny liability in this action. Lehtinen moved to dismiss this action based on claim preclusion and the election of remedies doctrine. He asserted that the Wickenhausers were precluded from claiming damages in this action because they were granted rescission in the first action.

¶ 11. The circuit court applied issue preclusion to Lehtinen's defenses to the allegations of misrepresentation and liability, and it also denied Lehtinen's motion to apply claim preclusion to the Wickenhausers' claim in this action. The circuit court did so because it concluded that there are no compulsory counterclaims in Wisconsin. The circuit court recognized that the Wickenhausers had attempted to consolidate the two cases and also noted that "damages were not available in [the first action] and the fact that the remedies available in each case were separate and distinct precludes the application of claim preclusion." The jury found damages resulting from the fraud in the amount of $274,184 and punitive damages in the amount of $500,000. Judgment was entered accordingly.

¶ 12. Lehtinen appealed the circuit court's decision, arguing, among other theories, that since the Wickenhausers obtained rescission in the first action, they are barred by the election of remedies doctrine from obtaining damages in this action. The court of appeals agreed. It concluded that the election of remedies doctrine bars a plaintiff from maintaining inconsistent legal theories and defrauded parties have to elect either to rescind or to affirm a contract. *Wickenhauser*, No. 2004AP2681, unpublished slip op., ¶ 13 (citations omitted). The court of appeals concluded that rescission is inconsistent with a claim for damages; and therefore, it reversed the circuit court. *Id.*, ¶ 18.

¶ 13. Since the court of appeals concluded that rescission in the first action barred recovery of damages in this action, it did not address a number of Lehtinen's alternative arguments that were made to the court of appeals but not to us, including whether: (1) applying issue preclusion to the questions of liability and fraud in the first action is fundamentally unfair in this action for damages; (2) the actual damages found by the jury were not supported by the evidence; (3) punitive damages should have been denied as a matter of law; and (4) Lehtinen was denied due process when the jury did not hear all the facts and circumstances surrounding the alleged fraud. *Id.*, ¶ 1 n.1.

¶ 14. We granted the Wickenhausers' petition to review the decision of the court of appeals.

## II. DISCUSSION

### A. Standard of Review

¶ 15. The circuit court resolved this case by denying Lehtinen's motion for summary judgment that was

based on claim preclusion and by confirming the jury's award of damages. The court of appeals applied the election of remedies doctrine to overturn the circuit court's decision. We review a denial of summary judgment independently, applying the same methodology as the circuit court. *AKG Real Estate, LLC v. Kosterman*, 2006 WI 106, ¶ 14, 296 Wis. 2d 1, 717 N.W.2d 835 (citing *O'Neill v. Reemer*, 2003 WI 13, ¶ 8, 259 Wis. 2d 544, 657 N.W.2d 403). The applications of the election of remedies doctrine, the doctrine of claim preclusion and the common-law compulsory counterclaim rule to a particular set of facts present us with questions of law that we review independently. *See Menard, Inc. v. Liteway Lighting Prods.*, 2005 WI 98, ¶ 23, 282 Wis. 2d 582, 698 N.W.2d 738.

## B. Election of Remedies

¶ 16. The election of remedies doctrine is "an equitable principle barring one from maintaining inconsistent theories or forms of relief." *Head & Seemann, Inc. v. Gregg*, 104 Wis. 2d 156, 159, 311 N.W.2d 667 (Ct. App. 1981), *aff'd and adopted*, 107 Wis. 2d 126, 127, 318 N.W.2d 381 (1982). The election of remedies doctrine requires a litigant to choose a remedy, where the remedies sought are inconsistent with one another.[2] 28A C.J.S. *Election of Remedies* § 16. The election of remedies doctrine has been described as applying where "a certain state of facts relied on as the basis of a certain

---

[2] A claim for relief in tort and a claim for relief in contract are not "remedies" to which the election of remedies doctrine applies. *Goetz v. State Farm Mut. Auto. Ins. Co.*, 31 Wis. 2d 267, 273, 142 N.W.2d 804 (1966). A remedy is the relief that is applied to a successful claim. *Id.*

remedy is inconsistent with, and repugnant to, another certain state of facts relied on as the basis of another remedy." *Roberts v. Sears, Roebuck & Co.*, 573 F.2d 976, 985 (7th Cir. 1978), *cert. denied*, 439 U.S. 860 (1978) (citations omitted).

¶ 17. The court of appeals in *Head & Seemann* explained that the traditional election of remedies doctrine in a contract action provides that a defrauded party may elect either to rescind[3] the contract and seek rescissory damages[4] or to affirm it and seek damages arising from the breach of contract.[5] *Head & Seemann*, 104 Wis. 2d at 159; *see also Harley-Davidson Motor Co. v. PowerSports, Inc.*, 319 F.3d 973, 988 (7th Cir. 2003). This choice is forced by the inconsistency in the factual predicate necessary for rescission of a contract and that necessary when affirming a contract. *Head & Seemann*, 104 Wis. 2d at 159 (citing *Seidling v. Unichem, Inc.*,

---

[3] One "rescinds" a contract by cancelling it unilaterally or by agreement. *Black's Law Dictionary* 1332 (8th ed. 2004).

[4] "Rescissory damages" are awarded to return a party to the position that party occupied before the wrongful act. *Id.* at 419. These damages are sometimes called "restorative damages." *Head & Seemann, Inc. v. Gregg*, 104 Wis. 2d 156, 165–67, 311 N.W.2d 667 (Ct. App. 1981), *aff'd and adopted*, 107 Wis. 2d 126, 127, 318 N.W.2d 381 (1982). Restorative damages do not arise from a contract, but from a wrongful act such as fraud in the inducement. *Id.* at 166. Rescission of a contract has been held to protect future rights, while money damages compensate for past injuries due to fraud. *Roberts v. Sears, Roebuck & Co.*, 573 F.2d 976, 985 (7th Cir. 1978), *cert. denied*, 439 U.S. 860 (1978).

[5] A party who breaches a contract is obligated to the aggrieved party for "benefit–of–the–bargain" damages "equal to the amounts that the aggrieved party would have received, including profits, if the contract had been fully performed." *Black's Law Dictionary* 416 (8th ed. 2004).

52 Wis. 2d 552, 557, 191 N.W.2d 205 (1971)). The underlying purpose of the doctrine of election of remedies "is to prevent double recovery for the same wrong." *Id.* Therefore, it "appears that if a claimant chooses to seek rescission [of a contract], he may not sue for damages [based on enforcement of the contract]." *Id.* Stated otherwise, one may not cancel a contract and also sue to enforce compliance with the contract's provisions.

¶ 18. In *Head & Seemann,* the court of appeals explained that rescission and restorative damages are entirely consistent when fraud or misrepresentation is the cause of the claim. *Id.* at 168.[6] The court concluded that a defrauded vendor of real estate who obtains rescission of a land contract and restitution of the land *in specie* may also recover damages for the loss of rents from the land for the period of the purchaser's posses-

[6] *See also* 2 Dan B. Dobbs, *Dobbs Law of Remedies* § 9.4, at 612 n.38 (2d ed. 1993) (stating that *Head & Seemann, Inc. v. Gregg,* 107 Wis. 2d 126, 318 N.W.2d 381 (1982), confronts the traditional election of remedies doctrine and modifies the rule to "permit the plaintiff to recover all consistent 'restorative' costs or damages"). A number of cases in various jurisdictions have allowed recovery of both rescission and some types of damages. *Id.* at 611–12 n.35 (citing *Seekings v. Jimmy GMC of Tucson, Inc.,* 638 P.2d 210 (Ariz. 1981) ("[C]onsequential damages may be awarded in a case where revocation of acceptance is granted."); *Landin v. Ford,* 727 P.2d 331, 332 (Ariz. 1986) ("A plaintiff electing rescission is entitled to those damages that are necessary to make him whole."); *Robison v. Katz,* 610 P.2d·201 (N.M. Ct. App. 1980); *Head & Seemann,* 107 Wis. 2d at 127; *First Equity Inv. Corp. v. United Serv. Corp. of Anderson,* 386 S.E.2d 245 (S.C. 1989). In addition, "the Uniform Commercial Code expressly permits both kinds of recovery." Dobbs, *supra,* at 611–12 & n.36 (citing U.C.C. § 2–711 as providing that "buyer's revocation of acceptance, analogous to rescission, permits recovery of any price paid and damages for non-delivery").

sion and for the vendor's out-of-pocket expenses. *Id.* The court stated, "restitutionary damages conform with the purpose of rescission, which is to put the defrauded party back in as good a position as he occupied before entering the contract." *Id.* at 166. The court noted that rescission rules out only "expectation" or benefit-of-the-bargain damages. *Id.*

¶ 19. Prior to our adoption of the court of appeals opinion in *Head & Seemann,* we examined the election of remedies doctrine in *Schwabe v. Chantilly, Inc.,* 67 Wis. 2d 267, 269, 226 N.W.2d 452 (1975). In *Schwabe,* a landlord sued the tenants for nonpayment of rent. *Id.* at 268–69. The tenants raised fraud in the inducement as an affirmative defense, but they did not counterclaim. *Id.* at 269. Judgment was awarded to the tenants based on that defense. *Id.* The tenants subsequently brought an action against the landlord and the landlord's managing officer, based on the same fraud. *Id.* We concluded that the election of remedies doctrine did not bar the action because the tenants' "assertion of the affirmative defense in the first action was not an election in the sense of commencing an action affirmatively seeking rescission of the lease." *Id.* at 278. We also concluded that where a subsequent action brought by a defendant in the first action did not "upset the determination reached in the first [action]", but rather, affirmed the first action, the doctrine of election of remedies did not bar a subsequent action brought by a party who was a defendant, and prevailed, in the first action. *Id.* at 274.

¶ 20. Like *Schwabe,* the Wickenhausers' present action does not "upset the determination" reached in the first action; rather, it affirms the first action. In the first action, the Wickenhausers asserted an affirmative defense based on fraud in the inducement of the option,

56

and the court, finding in favor of the Wickenhausers, rescinded the option. In this second action, the Wickenhausers are not seeking to enforce a contract provision against Lehtinen. Rather, this second action is based on fraud and the damages to them that resulted from Lehtinen's fraud. Therefore, it is consistent with the circuit court's factual findings and legal conclusions in the first action, i.e., that Lehtinen obtained the Wickenhausers' signature on the option by fraudulent misrepresentations. Since this second action was brought by a party who was a defendant in the first action and is consistent with the factual findings and legal conclusions of the first action, the doctrine of election of remedies does not bar it. We note that by permitting both rescission and restorative damages, the Wickenhausers will not receive a double recovery for the same injury. This is so because rescission of the option contract protects the Wickenhausers' future interest in their land and money damages compensates them for past injuries that were caused by Lehtinen's fraud.

C. Claim Preclusion and Common-law Compulsory Counterclaims

¶ 21. Lehtinen contends that all the elements of claim preclusion are met, and therefore, this action is barred. He seeks to preclude the Wickenhausers from asserting claims that they did not counterclaim for in the first action.

¶ 22. The elements of claim preclusion are: "(1) an identity between the parties or their privies in the prior and present suits; (2) an identity between the causes of action in the two suits; and, (3) a final judgment on the

merits in a court of competent jurisdiction." *N. States Power Co. v. Bugher,* 189 Wis. 2d 541, 551, 525 N.W.2d 723 (1995) (citing *DePratt v. W. Bend Mut. Ins. Co.,* 113 Wis. 2d 306, 311, 334 N.W.2d 883 (1983)). In describing claim preclusion in general terms, we have said, " 'a final judgment is conclusive in all subsequent actions between the same parties [or their privies] as to all matters which were litigated or which might have been litigated in the former proceedings.' " *Id.* at 550 (alteration in original) (quoting *Lindas v. Cady,* 183 Wis. 2d 547, 558, 515 N.W.2d 458 (1994)).

¶ 23. However, our general statements of claim preclusion involve the application of claim preclusion to a plaintiff in a second action who was also a plaintiff in the first action,[7] to a plaintiff in privity with the plaintiff in the first action,[8] or to a counterclaiming defendant who did not prevail in the first action.[9] Claim preclusion, *standing alone,* is not a bar to a subsequent

---

[7] *See, e.g., DePratt v. W. Bend Mut. Ins. Co.,* 113 Wis. 2d 306, 334 N.W.2d 883 (1983) (precluding a second action by DePratt against the same defendants); *Manu-Tronics, Inc. v. Effective Mgmt. Sys., Inc.,* 163 Wis. 2d 304, 471 N.W.2d 263 (Ct. App. 1991) (precluding Manu-Tronics' second suit where the first action was concluded by binding arbitration); *Jantzen v. Baker,* 131 Wis. 2d 507, 388 N.W.2d 660 (Ct. App. 1986) (precluding the plaintiff's re-litigation of liability that was decided in prior action).

[8] *Landess v. Schmidt,* 115 Wis. 2d 186, 340 N.W.2d 213 (Ct. App. 1983) (precluding a subsequent action against employees acting in their official capacities when the employer had been sued previously).

[9] *See, e.g., Vukelic v. Upper Third St. Sav. & Loan Ass'n,* 222 Wis. 568, 269 N.W. 273 (1936) (concluding that the first action determined that Vukelic had no claim to the money he asserted a right to in the second action); *Murphey v. Weil,* 92 Wis. 467, 66 N.W. 532 (1896) (concluding that because the jury

suit by a defendant who chooses not to counterclaim in the first action. Were this not so, claim preclusion would improperly operate as a compulsory counterclaim rule.

¶ 24. In Wisconsin, generally, counterclaims are permissive. Wis. Stat. § 802.07(1) (2005–06);[10] *Menard,* 282 Wis. 2d 582, ¶ 27. This general rule is grounded in "the belief that notions of fairness require that a defendant be given his day in court when and where he sees fit." *A.B.C.G. Enters., Inc. v. First Bank Se., N.A.,* 184 Wis. 2d 465, 476, 515 N.W.2d 904 (1994) (citing Restatement (Second) of Judgments § 22 cmt. a (1982)).

¶ 25. However, that is not to say that a defendant who has a claim against a plaintiff in the first action is always free to sit on his claim until some later lawsuit without danger of losing the right to bring it. Wisconsin also has adopted the common-law compulsory counterclaim rule that is set out in Restatement (Second) of Judgments § 22(2)(b) (1982). *Menard,* 282 Wis. 2d 582, ¶ 28; *A.B.C.G.,* 184 Wis. 2d at 476–77.

> The common-law compulsory counterclaim rule creates an exception to the permissive counterclaim statute and bars a subsequent action by a party who

found against Murphey in the first action, where he was a counterclaiming defendant for money sought again in this action, his claim was barred by claim preclusion); *Great Lakes Trucking Co. v. Black,* 165 Wis. 2d 162, 477 N.W.2d 65 (Ct. App. 1991) (concluding that the stipulation in the first action prevented Great Lakes from maintaining a subsequent action).

[10] Wisconsin Stat. § 802.07(1) provides, in pertinent part: "A defendant *may* counterclaim any claim which the defendant has against a plaintiff, upon which a judgment may be had in the action." (Emphasis added.)

All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

was a defendant in a previous suit if "a favorable judgment in the second action would nullify the judgment in the original action or impair rights established in the initial action." The common-law compulsory counterclaim rule operates to "preserve[] the integrity and finality of judgments and the litigant's reliance on them, by precluding a collateral attack upon a judgment in a subsequent proceeding."

*Menard*, 282 Wis. 2d 582, ¶ 28 (quoting *A.B.C.G.*, 184 Wis. 2d at 476–77).[11]

¶ 26. The common-law compulsory counterclaim rule is a narrow exception to the general rule of permissive counterclaims. It operates to protect the integrity of judgments from collateral attack by precluding a defendant in the first action from commencing a second action that will nullify the first judgment or impair rights established in the first action. *See* Kevin M. Clermont, *Common-Law Compulsory Counterclaim Rule: Creating Effective and Elegant Res Judicata Doctrine*, 79 Notre Dame L. Rev. 1745 (2004).

¶ 27. To determine whether the common-law compulsory counterclaim rule applies to this action, we begin by analyzing whether all the elements of claim

---

[11] In *A.B.C.G. Enterprises, Inc. v. First Bank Southeast, N.A.*, 184 Wis. 2d 465, 477, 515 N.W.2d 904 (1994), we quoted from the Restatement (Second) of Judgments § 22(2)(b) (1982) to explain the common-law compulsory counterclaim rule as follows:

(2) A defendant who may interpose a claim as a counterclaim in an action but fails to do so is precluded, after the rendition of judgment in that action, from maintaining an action on the claim if:

. . .

(b) The relationship between the counterclaim and the plaintiff's claim is such that successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action.

60

preclusion are present. *Menard,* 282 Wis. 2d 582, ¶ 28. In addition, the claim in the second suit, if successful, must nullify the first judgment or impair rights established in the first action. *Id.*

¶ 28. In this case, there is no dispute that the first action resulted in a final judgment on the merits in a court of competent jurisdiction. However, in regard to whether there is an identity of parties, we note that the parties in the two actions are not exactly the same. Wickenhauser Farms, Inc., was named as a defendant in the first action and is not named as a plaintiff in this action. Also, the Nielsens were not parties in the first action, but are named as defendants in this action. However, we have stated that there is an identity of parties when the parties are, "*for the most part,* identical." *Sopha v. Owens-Corning Fiberglas Corp.,* 230 Wis. 2d 212, 233 n.28, 601 N.W.2d 627 (1999) (emphasis added).

¶ 29. Similar to the parties in *Sopha,* the parties in this second action and the parties in the first action are, for the most part, identical. While the Wickenhausers' exact relationship to Wickenhauser Farms, Inc. is not clear, the Wickenhausers' answer to Lehtinen's complaint in the first action establishes that they are officers of Wickenhauser Farms, Inc.[12] The Nielsens were named as defendants in this action because of their possible mortgage interest in the property and

[12] We note that Wisconsin case law provides that the requirement of identity of parties is met when " 'the two actions involve a closely-held corporation in one case . . . and its principal shareholder in the other.' " *Manu-Tronics,* 163 Wis. 2d at 315 (citation omitted).

their possible contractual relationship with Lehtinen.[13] Regardless of the exact relationships of these parties, we agree with Lehtinen that Wickenhauser Farms, Inc. and the Nielsons are unrelated to the fraud allegations, and therefore, for purposes of the Wickenhausers' fraud claim, the parties are the same in both lawsuits.

¶ 30. Next, we turn to whether there is an identity of claims. This determination requires us to examine both lawsuits within the framework of the transactional analysis adopted from the Restatement (Second) of Judgments § 24 (1982). *Menard,* 282 Wis. 2d 582, ¶ 30 (citing *DePratt,* 113 Wis. 2d at 311). " 'Under this analysis, all claims arising out of one transaction or factual situation are treated as being part of a single cause of action.' " *Id.* (quoting *Parks v. City of Madison,* 171 Wis. 2d 730, 735, 492 N.W.2d 365 (Ct. App. 1992)). A transaction " 'connotes a natural grouping or common nucleus of operative facts.' " *Id.* (quoting Restatement (Second) of Judgments § 24 cmt. b (1982)). To determine whether claims arise from one transaction, "we may consider whether the facts are related in time, space, origin, or motivation." *Id.* (citing Restatement (Second) of Judgments § 24 cmt. b (1982)). We have noted that under the transactional analysis, "it is irrelevant that 'the legal theories, remedies sought, and evidence used may be different between the first and

---

[13] No argument was presented to us contending that the relationship between the Nielsens and Lehtinen rises to the level of privities, and therefore, we do not address this issue. However, we note that "[p]rivity exists when a person is so identified in interest with a party to former litigation that he or she represents precisely the same legal right in respect to the subject matter involved." *Pasko v. City of Milwaukee,* 2002 WI 33, ¶ 16, 252 Wis. 2d 1, 643 N.W.2d 72.

second actions.' " *Id.,* ¶ 32 (quoting *Kruckenberg v. Harvey,* 2005 WI 43, ¶ 26, 279 Wis. 2d 520, 694 N.W.2d 879); *see also N. States Power,* 189 Wis. 2d at 555 ("[T]he number of substantive theories that may be available to the plaintiff is immaterial—if they all arise from the same factual underpinnings.") (citing Restatement (Second) of Judgments § 24 cmt. a (1982)).

¶ 31. We conclude that there is an identity of claims between this second action and the first action because the fraud allegations arise out of the same operative facts, i.e., Lehtinen's fraudulent representations that caused the Wickenhausers to sign the option and his subsequent recording of it. The option was rescinded in the first action, and the court concluded that Lehtinen fraudulently induced the Wickenhausers to sign it. These are the same fraudulent representations that are the foundation for this action. That the legal theories employed or remedies sought may differ in each of the actions is not relevant to a transactional analysis of the claims. *Menard,* 282 Wis. 2d 582, ¶ 32. Accordingly, all three elements of claim preclusion are present here.

¶ 32. However, although we have concluded that all the elements of claim preclusion are met, this action will not be barred unless the Wickenhausers' claim was a common-law compulsory counterclaim because in Wisconsin, with this one narrow exception, counter-claims are permissive. Wis. Stat. § 802.07(1); *Menard,* 282 Wis. 2d 582, ¶ 27. In order to constitute a common-law compulsory counterclaim, the Wickenhausers' successful claim in this second action must nullify the judgment in the first action or impair rights established in the first action. *Menard,* 282 Wis. 2d 582, ¶ 28; *A.B.C.G.,* 184 Wis. 2d at 476–77.

¶ 33. In *A.B.C.G.*, First Bank Southeast, N.A. (First Bank) sued A.B.C.G. Enterprises, Inc. (ABCG) "in six separate actions seeking foreclosure of ABCG's interests in various properties pursuant to certain mortgage assumption agreements." *A.B.C.G.*, 184 Wis. 2d at 471. "[T]he circuit court entered default judgments of foreclosure in favor of First Bank" because ABCG did not respond to the service of First Bank's complaint. *Id.*

¶ 34. Subsequently, ABCG brought an action against First Bank, alleging misrepresentations as to the investment quality, breach of contract regarding schedules for payments and extension of additional credit, and failure to properly manage the properties. *Id.* at 471–72. Under those circumstances, we determined that a judgment in favor of ABCG would "directly undermine" the original default judgments in which the court foreclosed ABCG's interest in the properties. *Id.* at 483. Accordingly, the common-law compulsory counterclaim rule precluded ABCG's action. *Id.*

¶ 35. Similarly, in *Menard*, we concluded that Menard's action was barred by the common-law compulsory counterclaim rule because allowing Menard to recover would "undermine" Liteway Lighting Product's (Liteway) original judgment. *Menard*, 282 Wis. 2d 582, ¶ 2. Menard had purchased lighting products from Liteway and during the business relationship, Menard held back "money due to Liteway as 'credit' for products Menard claimed were defective." *Id.*, ¶ 3. After the business relationship ceased, "the parties began disputing the amount of money Menard owed Liteway." *Id.* Menard sued Liteway alleging it had not been reimbursed for some returned defective products and, as a result, Liteway had been unjustly enriched. *Id.*, ¶ 4.

Liteway answered, asserting claim preclusion as an affirmative defense because Menard's claims could have been brought in the prior action Liteway had maintained against Menard. *Id.,* ¶ 5. Liteway's prior action was for breach of contract due to unpaid invoices. *Id.,* ¶ 6. Liteway had obtained a default judgment in that first action due to Menard's failure to file a timely answer. *Id.,* ¶ 7.

¶ 36. Because of the collateral consequences that Menard's claims could have had on the judgment in the first action, we held that the common-law compulsory counterclaim rule barred Menard's subsequent suit for credit for the returned goods. *Id.,* ¶ 20. We stated, "Menard's claims fall under the common-law compulsory counterclaim rule because allowing Menard to proceed with its present suit would impair Liteway's rights as determined in the original action and would undermine the validity of the judgment Liteway obtained." *Id.,* ¶ 22.

¶ 37. In contrast to *A.B.C.G.* and *Menard,* in *Schwabe,* we concluded that because judgment was rendered in favor of the Schwabes as defendants in the first action based on the affirmative defense of fraud, the Schwabes were not required to have counterclaimed in the first action. *Schwabe,* 67 Wis. 2d at 273. Accordingly, we concluded that the Schwabes could bring a second action for damages caused by the fraud because the second action would not impair the rights established in the prior judgment. *Id.* at 274. In *Schwabe,* we explained that it was permissible for Schwabe to start a new action because Schwabe was "not in the position of attacking facts previously established." *Id.* at 273. As the Restatement of Judgments § 58 cmt. d (1982) states:

> Where the same facts constitute a defense to the plaintiff's claim and also a ground for counterclaim, and

the defendant sets up these facts as a defense but not as a counterclaim, and after litigation of the defense judgment is given for the defendant, the defendant is not precluded from maintaining a subsequent action against the plaintiff based upon these facts. In such a case he is not improperly splitting his cause of action . . ., although he uses the same facts first as a defense to the plaintiff's claim and later as the basis of an action against the plaintiff. In the subsequent action, the judgment in the prior action is conclusive as to the facts actually litigated and determined in the first action.

However, we also explained in *Schwabe* that where the plaintiff in the second action lost in the first action, he or she is barred from commencing a new action. *Schwabe,* 67 Wis. 2d at 272–73.

¶ 38. The Wickenhausers' action is not barred by the common-law compulsory counterclaim rule because, as with *Schwabe,* this second action does not nullify the first judgment or impair any rights established in that action. In the first action, the Wickenhausers were successful in their affirmative defense based on fraud. This action for damages is based on the same fraud that was proven in the first action. The Wickenhausers are not attacking factual findings or legal conclusions previously determined. Accordingly, the Wickenhausers were not required to have counterclaimed in the first action under the common-law compulsory counterclaim rule; and therefore, they are not precluded from seeking damages in this second action.

D. Economic Loss Doctrine

¶ 39. The Wickenhausers contend that because a contract to lend money was the basis for their relation-

ship with Lehtinen, we should explain that the fraud in the inducement exception to the economic loss doctrine is consistent with their claim. The economic loss doctrine is a judicially created rule that " 'preclud[es] contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship.' " *Kaloti Enters., Inc. v. Kellogg Sales Co.,* 2005 WI 111, ¶ 27, 283 Wis. 2d 555, 699 N.W.2d 205 (citations omitted). The doctrine is based on the premise that " 'contract law and the law of warranty, in particular, is better suited than tort law for dealing with purely economic loss in the commercial arena.' " *Id.,* ¶ 28 (citations omitted). As a general rule, "the economic loss doctrine requires transacting parties in Wisconsin to pursue only their contractual remedies when asserting an economic loss claim, in order to preserve the distinction between contract and tort law." *Digicorp, Inc. v. Ameritech Corp.,* 2003 WI 54, ¶ 34, 262 Wis. 2d 32, 662 N.W.2d 652.

¶ 40. In *Kaloti,* we adopted a narrow fraud in the inducement exception to the economic loss doctrine. *Kaloti,* 283 Wis. 2d 555, ¶ 42. We held that "a fraud in the inducement claim is not barred by the economic loss doctrine 'where the fraud is extraneous to, rather than interwoven with, the contract.' " *Id.* (quoting *Digicorp,* 262 Wis. 2d 32, ¶ 47, and citing *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.,* 532 N.W.2d 541, 545 (Mich. Ct. App. 1995)). We explained that to invoke this narrow fraud in the inducement exception, a plaintiff must demonstrate: "(1) there was an intentional misrepresentation . . .; (2) the misrepresentation occurred before the contract was formed . . .; and (3) the fraud [was] extraneous to, rather than interwoven with, the contract." *Id.,* ¶ 42 (internal quotation and citation omitted). Stated another way, the third require-

ment means "the fraud concerns matters whose risk and responsibility did not relate to the quality or the characteristics of the goods for which the parties contracted or otherwise involved performance of the contract." *Id.* We noted " 'misrepresentations [that] relate to the breaching party's performance of the contract' are interwoven with the contract and 'do not give rise to an independent cause of action in tort.' " *Id.,* ¶ 43 (quoting *Huron Tool,* 532 N.W.2d at 545) (alteration in original).

¶ 41. In the case before us, the Wickenhausers have stated a claim for intentional misrepresentation. Second, the misrepresentation occurred before the option was executed because the circuit court in the first action concluded Lehtinen's fraudulent misrepresentations, including the reasons Lehtinen wanted the option and his assurances that he would not record the option, misled the Wickenhausers into signing it.[14] Finally, we conclude that "the fraud [was] extraneous to, rather than interwoven with, the contract." As the circuit court in the first action concluded, Lehtinen's misrepresentations were made to induce the Wickenhausers to sign the option. The misrepresentations did

[14] Even though Lehtinen acknowledges the findings in the first action, he argues in his brief that the fraud did not precede the contract in this case because the option was signed on January 14, 1998 and the Wickenhausers testified they did not discuss the option, nor had they seen it, prior to that date. However, we do not believe the fact that the Wickenhausers did not discuss the option prior to that date means Lehtinen's misrepresentations were not made prior to when the Wickenhausers signed the contract. Common sense dictates that since the misrepresentations fraudulently induced the Wickenhausers to sign the option, those misrepresentations necessarily occurred prior to when the option was formed.

not relate to Lehtinen's performance of the contract, which was to obtain a $200,000 loan. Therefore, this fraud gives rise to an independent cause of action in tort.

¶ 42. Furthermore, we recognize that certain policy concerns articulated in *Kaloti* are pertinent to this case. In *Kaloti,* we explained that " 'Wisconsin has a long-standing principle that parties need a background of truth and fair dealing in commercial relationships.' Where the matter in question falls outside the contract, courts should be able to address a party's failure to act honestly with tort law, even if the parties are engaging in a commercial transaction." *Id.,* ¶ 47 (quoting *Van Lare v. Vogt, Inc.,* 2004 WI 110, ¶ 30, 274 Wis. 2d 631, 683 N.W.2d 46, and citing *Digicorp,* 262 Wis. 2d 32, ¶ 36). In addition, "the limited fraud in the inducement exception . . . promotes the economic loss doctrine's goal of protecting parties' freedom to contract. . . . Tort law will apply only under circumstances . . . where one party induces another into a contract by representing (or failing to disclose) a fact that would be material to the other party's decision to enter into the contract, but that concerns matters extraneous to the contract's terms." *Id.,* ¶¶ 48–49. We conclude that to promote truth and fair dealing, Lehtinen's misrepresentations to the Wickenhausers may be addressed by tort law because the fraud is extraneous to and not interwoven with the contract. Accordingly, this action is not precluded by the economic loss doctrine.[15]

---

[15] The concurrence inaccurately asserts, "the majority opinion extends the economic loss doctrine to the present case beyond any case this court has decided." Concurrence, ¶ 51. The concurrence then spends ¶¶ 51–63 explaining why we

¶ 43. Although we conclude that the Wickenhausers' claims for compensatory and punitive damages based on fraud are not barred by any of the doctrines discussed herein, we did not address several alternative arguments that were raised by Lehtinen to the court of appeals. These arguments include whether: (1) applying issue preclusion to the questions of liability and fraud in the first action is fundamentally unfair in this action for damages; (2) the actual damages found by the jury were not supported by the evidence; (3) punitive damages should have been denied as a matter of law; and (4) Lehtinen was denied due process when the jury did not hear all the facts and circumstances surrounding the alleged fraud. Because these issues were not briefed for us to consider, but were briefed to the court of appeals, we remand these issues to the court of appeals for further consideration consistent with this opinion.

## III. CONCLUSION

¶ 44. We conclude that the election of remedies doctrine does not bar the Wickenhausers from obtaining damages in this action because rescission of the option in the prior action is consistent with the subsequent award of damages. Furthermore, their claim in

should not "extend" the economic loss doctrine to "non-commercial" real estate transactions. The concurrence is simply wrong on the state of the law in Wisconsin. The majority opinion does not extend the economic loss doctrine into new contexts. For example, in a recent case, *Linden v. Cascade Stone Co.*, 2005 WI 113, 283 Wis. 2d 606, 699 N.W.2d 189, we concluded that a contract to construct residential real estate was subject to the economic loss doctrine; and therefore, the Lindens were required to proceed on contract claims rather than tort claims. *Id.* at ¶¶ 17, 25.

this action is not barred by claim preclusion, nor did the common-law compulsory counterclaim rule require the Wickenhausers to bring their claim for damages as a counterclaim in the first action. Furthermore, the fraud in the inducement exception to the economic loss doctrine is consistent with our holding. However, we do not address several alternative arguments raised by Lehtinen to the court of appeals because they were not brought before us for consideration. Accordingly, we reverse the court of appeals determination and remand to the court of appeals for further proceedings consistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded to the court of appeals.

¶ 45. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). I agree with the majority opinion that the Wickenhausers have a claim for intentional misrepresentation and are not barred by the election of remedies in pursuing it. I cannot, however, join the majority opinion's discussion of the economic loss doctrine for two reasons:

> I. The majority opinion's discussion of the economic loss doctrine ignores the parties' arguments and decides the application of the economic loss doctrine to the present case—an issue that the parties did not raise or brief.

> II. Without briefs or argument by the parties and without analysis, the majority opinion extends the economic loss doctrine to the present case, beyond any case this court has decided.

I

¶ 46. The parties agree that the economic loss doctrine does not apply in the present case.

¶ 47. The Lehtinens contend that "the economic loss doctrine is completely irrelevant to this case. . . . Lehtinens have never raised the economic loss doctrine as a defense. . . . The issue in this case is not whether Wickenhausers can bring a claim for fraud, or seek consequential damages, but whether they can choose remedies which are legally inconsistent."[1]

¶ 48. The Wickenhausers argue that if this court holds that they have made an election of remedies and chosen contract remedies, then the court should adopt a fraud-in-the-inducement-like exception to the election of remedies doctrine, like the *Kaloti*[2] fraud-in-the-inducement exception to the economic loss doctrine.[3]

¶ 49. Because the majority opinion holds that the election of remedies doctrine does not apply to the present case, no discussion of a fraud-in-the-inducement-like exception to the election of remedies is needed.

¶ 50. Because the majority opinion ignores the parties' arguments and needlessly reaches the application of the economic loss doctrine to the facts of the present case, I do not join the majority opinion's discussion of the economic loss doctrine.

---

[1] Defendant's-Appellants' (Lehtinens') Response Brief and Appendix at 26.

[2] *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 29, 283 Wis. 2d 555, 699 N.W.2d 205.

[3] Reply Brief of Wickenhausers at 13–14 ("Wickenhausers acknowledged that cases involving the economic loss doctrine arise from a contract for the sale of goods. That did not occur here. However, the principle [of fraud in the inducement] is what is important: when deliberate misrepresentation induces another into a transaction with a false sense of the risks, duties or obligations involved, the party so induced is able to pursue damages.").

## II

¶ 51. Furthermore, without briefs or argument by the parties and without any analysis, the majority opinion extends the economic loss doctrine to the present case beyond any case this court has decided.

¶ 52. An unstated premise underlying the majority opinion's discussion of the economic loss doctrine is that the economic loss doctrine applies to the present case, that is, it applies to a noncommercial real estate transaction in which a party claims intentional misrepresentation and in which at least one party was not sophisticated and was not represented by counsel during negotiations. The majority opinion cites no case supporting its unstated premise.

¶ 53. This court has not decided whether the economic loss doctrine covers all real estate transactions.

¶ 54. A short history of the economic loss doctrine demonstrates the point. The economic loss doctrine is a judicially created doctrine that, in theory, seeks to preserve the distinction between contract law and tort law because "contract law and the law of warranty, in particular, is better suited than tort law for dealing with purely economic loss in the commercial arena."[4]

¶ 55. In prior cases, the court has broadened the economic loss doctrine from addressing "damages resulting from inadequate value because the product is inferior and does not work for the general purposes for which it was manufactured and sold" in a commercial transaction[5] to addressing those damages in a con-

---

[4] *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 404, 573 N.W.2d 842 (1998).

[5] *Id.* at 400–01 (internal quotation marks omitted) (remote commercial purchaser); *Sunnyslope Grading, Inc. v. Miller,*

sumer transaction as well.[6] In these circumstances, claims of negligent and strict liability misrepresentations were barred by the economic loss doctrine.[7]

¶ 56. In *Mose v. Tedco Equities—Potter Road Ltd. Partnership,* 228 Wis. 2d 848, 598 N.W.2d 594 (Ct. App. 1999), the court of appeals applied the economic loss doctrine to a commercial real estate transaction involving land that both the seller and buyer knew was contaminated. The contract provided for clean-up of the contamination. The court of appeals simply stated that it did not "discern any reason to forego application of the economic loss doctrine simply because the 'product' is real estate." *Id.* at 859.

¶ 57. *Kailin v. Armstrong,* 2002 WI App 70, ¶ 27, 252 Wis. 2d 676, 643 N.W.2d 132, also involved a commercial real estate transaction. The complaint alleged that the defendants had intentionally failed to disclose that one of the tenants had a history of delinquency in rent payments and was in default at the time of the offer and the closing. In a single sentence citing only to the *Mose* case, the court of appeals stated that the economic loss doctrine "applies when real estate is the subject of the contract." *Id., ¶ 27.*

¶ 58. Although the court of appeals seemed to be on its way to extend the economic loss doctrine to all

*Bradford & Risberg, Inc.,* 148 Wis. 2d 910, 437 N.W.2d 213 (1989) (commercial transaction).

[6] *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.,* 225 Wis. 2d 305, 311, 324, 592 N.W.2d 201 (1999).

[7] Other cases have addressed the application of the economic loss doctrine in contracts for services and in mixed contracts for services and products. *See Ins. Co. of N. Am. v. Cease Elec. Inc.,* 2004 WI 139, 276 Wis. 2d 361, 688 N.W.2d 462 (holding that economic loss doctrine does not apply to contracts for service).

real estate contracts, this court in *Van Lare v. Vogt, Inc.,* 2004 WI 110, ¶ 21, 274 Wis. 2d 631, 683 N.W.2d 46, constricted the applicability of the *Mose* and *Kailin* cases.

¶ 59. Referring to the *Mose* and *Kailin* cases as addressing whether the economic loss doctrine applies to commercial real estate contracts, this court in *Van Lare* refused to decide whether the economic loss doctrine applies to all real estate transactions. Specifically, the *Van Lare* court announced that "we do not decide today whether the broader conceptualization of the economic loss doctrine in *Tietsworth* covers all real estate transactions . . . ." *Van Lare,* 274 Wis. 2d 631, ¶ 21.

¶ 60. The *Van Lare* court applied the economic loss doctrine only to commercial real estate transactions negotiated at arms' length between two sophisticated parties represented by counsel during a negotiation process that resulted in a written bargained-for contract, when the complainant alleged strict liability misrepresentation. The *Van Lare* court concluded that applying the economic loss doctrine in such a case furthers the policies that justify the doctrine's existence. *Van Lare,* 274 Wis. 2d 631, ¶ 24.

¶ 61. Thus, the *Van Lare* court left open the question of the extension of the economic loss doctrine in real estate transactions to noncommercial transactions, to claims of intentional misrepresentation, to transactions between unsophisticated parties negotiating without counsel, and to transactions with an oral agreement or with a not-fully-bargained-for agreement.[8]

---

[8] The *Van Lare* court cited, but without comment, the court of appeals certification memorandum suggesting that "strict

¶ 62. After *Van Lare,* this court adopted, in a product case, a fraud-in-the-inducement exception to the economic loss doctrine when intentional misrepresentation is alleged.[9] The applicability of the fraud-in-inducement exception in a real estate case was not decided.

¶ 63. The next case of interest is *Linden v. Cascade Stone Co., Inc.,* 2005 WI 113, 283 Wis. 2d 606, 699 N.W.2d 189, cited by the majority opinion at ¶ 42 n.15. At issue in *Linden* was the applicability of the economic loss doctrine to a contract to construct a residence.[10] A contract for the construction of a house, a dwelling, or any other architectural structure is significantly—and

---

liability misrepresentation may well apply in situations where the parties are not in equal bargaining positions or the purchaser may not be in the best position to assess the risk of economic loss—two assumptions upon which the economic loss doctrine rests." *Van Lare,* 274 Wis. 2d 631, ¶ 32.

[9] *Kaloti,* 283 Wis. 2d 555, ¶ 29. The adoption of this rule followed discussion and disagreement by the court in whether such an exception should be recognized in *Digicorp, Inc. v. Ameritech Corp.,* 2003 WI 54, 262 Wis. 2d 32, 662 N.W.2d 652, and *Tietsworth v. Harley-Davidson, Inc.,* 2004 WI 32, 270 Wis. 2d 146, 677 N.W.2d 233.

[10] Specifically, the three questions before the *Linden* court were:

> (1) whether a general contract to complete a described project, whereunder the general contractor subcontracts with others to assist in completing the project and a claim is made for negligent services provided by the subcontractors, controls the analysis of whether the contract is primarily for goods or primarily for services; (2) whether an objective test should be used by Wisconsin courts to determine if the predominant purpose of a mixed contract was for the sale of a product or to provide services; and (3) whether the "integrated system limitation" of the "other property exception" to the economic loss doctrine applies to bar a negligence claim against a subcontractor who provided services in the construction of a house.

legally—different from a contract to purchase real estate (whether it be land or land with existing structures). Recognizing this distinction, the *Linden* court examined the applicability of the economic loss doctrine to a contract for the construction of a house as a contract for goods (or products) and services, and not as a contract for a real estate transaction.

¶ 64. In deciding whether the economic loss doctrine applied to the contract for construction of a house, the *Linden* court described how "[s]ome contracts encompass both products and services. We use the predominant purpose test to determine whether a mixed contract for products and services is predominantly a sale of a product and therefore subject to the economic loss doctrine, or predominantly a contract for services and therefore not subject to the economic loss doctrine . . . ." *Linden,* 283 Wis. 2d 606, ¶ 8 (citations omitted).

¶ 65. The *Linden* court concluded "that under the totality of circumstances, the predominant purpose of the contract was for a product, a new house, rather than one for services." *Linden,* 283 Wis. 2d 606, ¶ 25. The *Linden* court also announced, "We conclude that when one contracts with a general contractor to build a house and the general contractor subcontracts with others to provide various services, the general contract controls whether the economic loss doctrine is available as a defense. . . . In the present case, we conclude that the general contract between the Lindens and Groveland was primarily for a product . . . ." *Id.,* ¶ 32.

---

*Linden v. Cascade Stone Co., Inc.,* 2005 WI 113, ¶ 4, 283 Wis. 2d 606, 699 N.W.2d 189. The plaintiffs claimed "faulty workmanship in the construction of their house," and alleged "breach of contract and warranty stemming from alleged defects in the house and delay in completion of the project." *Id.,* ¶¶ 1, 3.

¶ 66. Nowhere in *Linden* is a reference, even in passing, to the *Mose, Kailin,* or *Van Lare* cases or to a contract or transaction relating to real estate.[11] It is abundantly clear that *Linden* addressed only the application of the economic loss doctrine in the context of a contract to build a house, a contract for goods and services. The *Linden* court made clear that the predominant purpose test specifically related to contracts for goods (a house), explaining that

> [t]he predominant purpose test was developed in the Uniform Commercial Code (UCC) context when contracts that were alleged to be sales (Wis. Stat. ch. 402) occurred. Because the sales chapter of the UCC applies to transactions in goods, Wis. Stat. § 402.102, and many contracts involved both goods and services, it was necessary to determine which component was predominant.

*Linden,* 283 Wis. 2d 606, ¶ 9.

¶ 67. *Linden* applies to a construction contract, a contract involving goods and services, not to a contract for a real estate transaction as the phrase "real estate transaction" is used in *Mose, Kailin, Van Lare,* and the present case.

¶ 68. Without briefs from the parties on the issue of whether the economic loss doctrine should be extended beyond *Van Lare* to the type of real estate transaction at issue in the instant case or the claim of intentional misrepresentation, the majority opinion holds that the economic loss doctrine is applicable to the present noncommercial real estate transaction in-

---

[11] The *Linden* court examined *Van Sistine v. Tollard,* 95 Wis. 2d 678, 291 N.W.2d 636 (Ct. App. 1980), which applied the predominant purpose test to a contract to install windows, install stucco siding, reposition appliances, and perform finishing.

volving at least one unsophisticated party negotiating without counsel and without a fully written, bargained-for contract. The majority's expansion of the economic loss doctrine beyond *Van Lare* to the present case is unsupported and unwarranted.

¶ 69. Irrespective of the fraud-in-the-inducement exception to the economic loss doctrine that the majority opinion applies, I conclude that the Wickenhausers have a claim for intentional misrepresentation. Wisconsin law has recognized that one who intentionally deceives another with the intent and effect of inducing reliance to the other's detriment will be liable in tort.

¶ 70. For the reason set forth, I write separately.

¶ 71. I am authorized to state that Justices ANN WALSH BRADLEY and LOUIS B. BUTLER, JR. join this opinion.