BERNER CHEESE CORPORATION
n/k/a Berner Foods Corporation,
Plaintiff-Appellant-Petitioner,

v.

Lyle A. KRUG, Plager, Hasting & Krug, Ltd. and
ISBA Mutual Insurance Company,
Defendants-Respondents.

Supreme Court

*No. 2005AP1527. Oral argument November 28, 2007.
—Decided July 15, 2008.*

2008 WI 95

(Also reported in 752 N.W.2d 800.)

251

For the plaintiff-appellant-petitioner there were briefs by *Edward R. Garvey, Christa Westerberg* and *Garvey McNeil & McGillivray,* Madison, and *Eugene J. Schiltz, Sean B. Crotty,* and *Robert F. Coleman & Associates,* Chicago, Ill., and there was oral argument by *Eugene J. Schiltz.*

For the defendants-respondents there was a brief by *Michael B. Van Sicklen, Michael S. Heffernan,* and

*Foley & Lardner LLP,* Madison, and *Daniel F. Konicek* and *Konicek & Dillion, P.C.,* Geneva, Ill., and there was oral argument by *Daniel F. Konicek.*

¶ 1. PATIENCE DRAKE ROGGENSACK, J. We review a decision by the court of appeals that affirmed the circuit court's[1] dismissal of the petitioner's claim for breach of fiduciary duty and its request for a jury question on punitive damages. The circuit court concluded that the evidence admitted at trial was insufficient to support both Berner Cheese Corporation's[2] (Berner) breach of fiduciary duty claim and the submission of a punitive damages question to the jury. The court of appeals agreed that Berner did not present credible evidence that it suffered damages due to conduct Berner characterized as a breach of Attorney Lyle Krug's fiduciary duty to it. *Berner Cheese Corp. v. Krug,* No. 2005AP1527, unpublished slip op., ¶ 24 (Wis. Ct. App. Dec. 5, 2006). In regard to punitive damages, the court of appeals concluded that due to the set-offs from damages awarded in Berner's legal malpractice claim, Berner collected no compensatory damages. Therefore, it could not be awarded punitive damages. *Id.,* ¶ 29.

¶ 2. On this review, we are asked to resolve two issues: (1) whether Berner presented credible evidence to maintain its claim for breach of fiduciary duty; and (2) whether Berner presented credible evidence to submit a punitive damages question to the jury. We answer both inquiries in the negative and affirm the court of appeals, albeit on different grounds.

[1] The Honorable James E. Welker of Rock County presided.

[2] Berner Cheese Corporation is now known as Berner Foods Corporation.

256

## I. BACKGROUND

¶ 3. This case arises from a series of separate lawsuits and countersuits between Berner and Dairy Source, Inc. (Dairy Source) that proceeded in both federal and state courts. Therefore, a review of two distinct phases of litigation will assist the reader in understanding our resolution of the case now before us. Accordingly, we divide the "Background" section, such that part A discusses the underlying litigation between Berner and Dairy Source, as well as the events precipitating that litigation, and part B summarizes the present lawsuit.

### A. Underlying Litigation

¶ 4. Berner is located in Illinois. It manufactures and sells cheese. The company is owned and operated by brothers, Steve and Ed Kneubuehl. Berner had employed Lyle Krug as its corporation counsel since the Kneubuehls purchased the company in the early 1980s. Dairy Source is a cheese brokerage and distribution company that maintained its offices in Delavan, Wisconsin.

¶ 5. The first lawsuit between Berner and Dairy Source began in Walworth County Circuit Court in April 1999, as a part of Berner's efforts to retrieve its recipes and customer lists from a former employee, Tony Steinmann. Tony Steinmann was the spouse of Dairy Source's owner, Rose Steinmann.

¶ 6. Prior to his resignation from Berner, Tony worked out of an office in Delavan, Wisconsin leased by Dairy Source. Although Dairy Source was identified as the leaseholder of the Delavan office space, Dairy Source and Berner shared the rent evenly and split the cost of support staff.

257

¶ 7. Tony Steinmann resigned from Berner in March 1999. His departure from Berner was acrimonious. At that time, Tony, alone, possessed Berner's full customer list, as well as Berner's catalogue of recipes, pricing and formulas for its processed cheese division. The information was stored in his Delavan office. The ill-will created by Tony's departure and Tony's subsequent employment by his wife's company, Dairy Source, led Berner's owners to fear that Tony would use Berner's customer and product information to Berner's detriment.

¶ 8. Steve and Ed Kneubuehl, Berner's owners, expressed their concern to Krug about Tony's possession of Berner's customer lists and recipes. They sought Krug's advice about retrieving their property. Krug responded in an April 5, 1999 letter to Steve Kneubuehl, outlining possible courses of action.

¶ 9. Krug advised the Kneubuehls of three options available to Berner to retrieve its property: (1) directly communicate with Rose Steinman, owner of Dairy Source, to obtain her consent for Berner to retrieve its property located in the Delavan office; (2) obtain a court order directing that Berner's property located in Delavan be returned to it; or (3) enter the Delavan office without Rose Steinman's prior consent and retrieve Berner's property. Krug characterized the third option as a "self-help" option.

¶ 10. In the letter, Krug discussed certain risks attending the identified courses of action. He explained that the first two options were of equally low risk. However, while Krug indicated in the letter that "as a matter of law" Berner is "entitled to access [its] leased property and to inspect [that] property at any time of the day or night," he also explained that the third option "features certain legal risks and practical risks." Krug

identified those risks as being criminal liability for computer crime, for acting as a " 'party to a crime,' " and for "theft and burglary." Accordingly, Krug's letter instructed that only those electronic files belonging to Berner should be "removed or copied" and that "[n]o files that relate to Dairy Source, Inc. or any other non-Berner business should be removed." Krug also counseled Berner to "take all practical steps possible to advise the local law enforcement authorities" that Berner was on the premises to remove its property, because doing so would render it "less likely that a prosecution will be brought." Krug's letter concluded by stating that he has "not authorized or directed your entry onto [the Delavan offices'] premises."

¶ 11. Ed Kneubuehl testified that Krug recommended that Berner pursue the "self-help" option and enter the Delavan offices without Dairy Source's prior consent. However, he also testified that he, Steve and Cheryl Kneubuehl,[3] decided collectively to take the "self-help" course of action and enter the Delavan office without Dairy Source's consent. Ed testified that, although Krug informed the Kneubuehls that "anybody can file a lawsuit at any time," Krug assured them that they "were doing everything correctly and that since [they] were following [Krug's] orders" Berner encountered no appreciable risk of being sued by Dairy Source. Krug assured Ed and Steve that, "as long as [Berner employees] go [into the Delavan offices] during the day[4] and present ourselves to the people up front there

---

[3] Cheryl and Steve were spouses at the time.

[4] The Kneubuehls had originally planned to enter the Delavan offices at night, but reconsidered after one of Krug's law partner's, Duane Hastings, dissuaded them from doing so. He pointed out that a night-time entry without consent "sound[ed] like breaking and entering" to him.

shouldn't be any problem with going in and demanding [Berner's] property back," because Berner "paid for the rent" and "paid for the people" at the Delavan offices.

¶ 12. Krug accounted for certain contingencies associated with Berner's plan to enter the Delavan offices. For instance, he enlisted the services of a private detective, Michael Boomgarden, who participated in the entry. Krug sent Boomgarden a letter four days before the entry occurred, with instructions related to the entry. Krug instructed that those participating in the entry deliver to Michael Matthias, an employee of Dairy Source who was anticipated to be the most senior of the Dairy Source personnel present at the Delavan offices, letters documenting Berner's purpose for entering. In the letter, Krug admonished Boomgarden to "be prepared to testify after service [of the letters] whether or not [Matthias] agreed to the removal of the property or objected to the removal of the property."

¶ 13. Krug also advised them to steer clear of computer equipment, not to remove anything that was not Berner property, and, as Ed Kneubuehl testified, if the police arrived at any point, to "get the . . . trucks with the documents out of there and back to [the Berner headquarters in] Illinois so that they wouldn't be tied up." Krug explained that the individuals from Berner "should talk to the police and explain to them what [they] were doing."

¶ 14. In addition, because Krug anticipated that Berner would not recover all of the documents related to its customers and products that Berner sought, he advised Berner to retain the law firm of Brennan, Steil, Bastings and MacDougall, S.C. (Brennan) to file a replevin action against Dairy Source in Walworth County Circuit Court the day after the entry.

260

¶ 15. Ed Kneubuehl, Boomgarden and other Berner employees entered the Delavan offices the morning of April 12, 1999, when the Kneubuehls knew that Rose and Tony Steinmann[5] would be in Las Vegas. Ed testified that he was prepared to follow Krug's advice not to enter the offices unless Matthias was present and gave them consent to enter. The group arrived at the offices at approximately 7:30 a.m. and, as expected, Matthias was present. Ed greeted Matthias by saying he had an "order" from his brother Steve in the form of a letter explaining the group was there to perform an "audit," then handed Matthias the letter and informed him that they were there to retrieve Berner's property. Matthias permitted the group to enter, and they began to collect boxes of material.

¶ 16. While Ed and Matthias talked, the others removed 33 boxes of documents from the Delavan offices. At some point during the removal of documents, a Dairy Source employee reached Rose Steinmann in Las Vegas to inform her that Berner employees were removing boxes of documents from the premises. She instructed the employee to call the police. After Dairy Source contacted the police, Ed instructed the Berner employees to take the boxes they had removed back to Berner's offices in Illinois. However, pursuant to Krug's instructions, Ed and Boomgarden stayed behind to explain their purpose to the police.

¶ 17. As Krug had anticipated, Berner determined that it had not retrieved all of its property from the Delavan offices. Consequently, Brennan filed a replevin action in Walworth County Circuit Court on Berner's behalf the following day. In response, Dairy

---

[5] On April 12, 1999, Tony Steinmann was employed by Dairy Source, his wife's company.

Source filed multiple counterclaims against Berner, including conversion, fraud, interference of contract and misappropriation of trade secrets. Berner dismissed the replevin suit and filed a new action against Dairy Source in federal court. Dairy Source then filed a motion in the replevin action that requested attorney's fees and costs, claiming that Berner's replevin action was frivolous.

¶ 18. In the federal suit, Berner sought to retrieve both the remainder of its property and unauthorized commissions it alleged that Tony Steinmann paid himself while employed by Berner. Dairy Source again counterclaimed against Berner and the Kneubuehls.[6]

¶ 19. Although Brennan was independent litigation counsel for Berner in all of these court actions, Krug maintained his role as corporation counsel. Krug's view of the litigation at that time led him to believe Berner would prevail in its claims against Dairy Source. Accordingly, when the Kneubuehls approached Krug and suggested that they would accept a $300,000 payment from Dairy Source to settle the lawsuits, he advised them against suggesting settlement to Dairy Source. Krug explained that he believed Berner would receive more than $300,000 as a result of the litigation and that Berner's making an offer to settle would show weakness.

---

[6] In the federal lawsuit, Berner asserted nine claims against Dairy Source: Federal Racketeer Influenced and Corrupt Organizations Act violation, 18 U.S.C. 1962(c) & (d); fraud; conversion; misappropriation of trade secrets; replevin; infringement of trademark; defamation; civil conspiracy; and breach of fiduciary duty. Dairy Source's counterclaim alleged: breach of contract; tortious interference with contract; injury to business, contrary to Wis. Stat. § 134.01 (1997–98); and misappropriation of trade secrets, contrary to Wis. Stat. § 134.90 (1997–98).

¶ 20. Because Brennan defended against the claims by Dairy Source in part by contending that Berner had acted in accordance with Krug's advice, Dairy Source deposed Krug on two occasions. Dairy Source subpoenaed many of Krug's records for those depositions. Krug's law partner, Duane Hastings, represented Krug at both depositions and Brennan represented Berner.

¶ 21. Following the depositions, both Krug and Hastings concluded that it was likely that Dairy Source would add Krug as a defendant to its claims against Berner. Krug and Hastings realized that Krug possessed potentially damaging meeting notes about Berner's entry into the Delavan offices that would not be protected by the attorney-client privilege because a third party had been present for those meetings. They feared that documents in Krug's file could expose him to legal malpractice; they also feared that the notation that one of Berner's goals, to "[e]liminate Steinmann as competitor,"[7] would expose Berner to punitive damages. Consequently, Hastings averred that he "wanted to get [the suit] settled before . . . Krug's undisclosed notes got turned over to the Steinmanns."

¶ 22. Krug expressed concern to his law partners and to Berner's attorneys at Brennan that he might not be insured for the claims of Dairy Source. Dairy Source moved to add Krug as a defendant shortly after his second deposition was taken.

¶ 23. Subsequent to Dairy Source's motion, Brennan attorneys met with Steve, Ed, and Cheryl Kneu-

---

[7] Prior to the entry into the Delavan offices, Krug and the Kneubuehls listed goals they wanted to attain from the entry. Ed Kneubuehl testified that "[e]liminate Steinmann as competitor" was never a goal of Berner's; that Krug had inserted that statement into the list of goals on his own accord.

buehl to discuss the case. They explained that the litigation was not going well, that a trial would be expensive, and that Berner faced the possibility of losing. They advised Berner to settle. The Brennan attorneys also explained that Krug could be named as a defendant in the suit. Ed Kneubuehl testified that Brennan's advice represented a "180 degree[]" reverse in litigation strategy.

¶ 24. Ed and Steve then met separately with Krug. Krug echoed the words of the Brennan attorneys; he informed them that Berner faced exposure to punitive damages and the case could cost Berner millions of dollars. He further informed them that Brennan attorneys and he could be named as defendants. Krug requested that Berner indemnify him. Krug did not suggest to Ed and Steve that Berner and Krug might have a conflict of interest if Krug became a party.

¶ 25. Following the meeting with Krug, Ed and Steve decided to begin settlement discussions with Dairy Source. Steve averred that one of the reasons Berner chose to settle was because it was "tired of fighting and . . . wanted to end the litigation." Cheryl also stated that Berner was "legal weary."

¶ 26. Krug sent Steve a letter that Krug characterized as a summary of their previous meeting. In the letter, Krug stated that "[y]ou will be receiving legal advice from the Brennan . . . law firm on this matter." Krug also stated that it was likely that he would be added as a party and would therefore "be seeking indemnification" for damages and for attorney's fees. The record is silent in regard to Berner's response to Krug's request that Berner indemnify him. However, Berner, through a Brennan attorney, requested that Krug contribute $200,000 toward a settlement with Dairy Source. Krug declined.

¶ 27. Berner authorized Brennan attorneys to offer a settlement to Dairy Source. Brennan relayed Berner's offer to settle to Dairy Source, but when Dairy Source balked, Steve and Ed Kneubuehl decided to meet directly with Rose and Tony Steinmann, without either side's attorneys being present, to negotiate a settlement. During that meeting between the owners of both companies, Berner and Dairy Source agreed that Berner would pay Dairy Source $1.35 million. Dairy Source agreed not to use, distribute, or copy Berner's proprietary information, including its formulas, recipes and pricing information. In addition, both Berner and Dairy Source agreed to dismiss all claims against each other in all court actions and not to sue each other based on the events that gave rise to their then ongoing litigation.

¶ 28. Multiple witnesses testified that Krug played no role in the settlement that was reached. Ed averred that Krug had no input on the settlement amount reached. Cheryl testified further, stating that to her recollection, Krug did not have any input into the settlement. Krug did, however, review a draft of the settlement document and relayed one suggestion to a Brennan attorney: that the confidentiality provisions be relaxed to allow the settlement to be discussed with tax authorities and with Berner's insurers. The settlement document included a release of all claims against Krug. A Brennan attorney testified that neither Krug nor Krug's law firm, who represented Krug, pressured Berner to include a release for Krug in the settlement document. The attorney testified that Krug was released because "[w]e wanted to make sure that everybody in the civil action that was a party defendant or a possible party defendant" would be insulated from

265

further legal liability. Steve Kneubuehl testified that it was not Berner's idea to add Krug to the releases the settlement document provided; he did not know how Krug came to be listed among those who were released from claims.

## B. Present Litigation

¶ 29. Following the settlement and the dismissal of all the underlying litigation, Brennan commenced this action in Rock County Circuit Court. Brennan sued Berner to collect its fees for legal services that Brennan provided to Berner in the underlying litigation. Berner counterclaimed, alleging legal malpractice. It also filed a third-party action against Krug, his law firm and their insurers, alleging legal malpractice and breach of fiduciary duty.[8] Berner asserted that: (1) Krug's limited advice about the risks attending Berner's decision to enter the Delavan offices of Dairy Source to retrieve its property constituted legal malpractice; and (2) the settlement agreement between Berner and Dairy Source that resolved all claims relating to Berner's entry into Dairy Source's offices to retrieve its property constituted a business transaction between Berner and Krug in which Krug had breached his fiduciary duty to Berner.

¶ 30. Berner hired Marquette Law School Professor and Associate Dean Peter Rofes as an expert witness. Professor Rofes testified at a deposition that Krug's conduct fell below the standard of care attorneys must exercise in representing clients and that Krug's

---

[8] Berner filed additional claims, but they are not at issue in this review.

interests conflicted with Berner's during the litigation. However, Professor Rofes expressed no opinion about whether the case settled for an appropriate sum or whether Krug's conduct was a cause of Berner's alleged damages.

¶ 31. The parties both filed motions for summary judgment. The circuit court denied Berner's motion and granted Krug's motion, ruling that Berner's claim for malpractice constituted a legal duplication of its claim for breach of fiduciary duty. Berner appealed.

¶ 32. The court of appeals reversed, holding that malpractice and breach of fiduciary duty are legally distinct claims and that Berner's evidence supporting its malpractice claim was sufficient to withstand summary judgment. *See Brennan, Steil, Basting & Mac-Dougall, S.C. v. Berner Cheese Corp.*, No. 2003AP919, unpublished slip op., ¶ 1 (Wis. Ct. App. May 25, 2004). Accordingly, the court of appeals remanded the matter to the circuit court. *Id.*

¶ 33. On remand, Berner tried its claims to a jury. At the conclusion of the presentation of the evidence, the circuit court submitted Berner's claim for legal malpractice to the jury, but dismissed Berner's claim for breach of fiduciary duty and it refused to submit a jury question on punitive damages. The court reasoned that the breach of fiduciary duty claim failed because Berner produced no evidence to show that Krug or his law firm received a benefit at Berner's expense as a result of Berner's settlement with Dairy Source. The court refused to submit a question on punitive damages because Berner presented no evidence to show that Krug knew that his advice "was substantially likely to cause harm to Berner."

¶ 34. On the legal malpractice claim, the jury found Krug causally negligent, but it also found Berner

40% contributorily negligent. The jury awarded Berner $850,000 in damages for Krug's malpractice, but that amount was reduced by 40% for Berner's own negligence. However, due to set-offs resulting from $990,000 in payments to Berner by other parties in other lawsuits, Berner collected none of the jury's damage award.[9]

¶ 35. Berner appealed, and the court of appeals affirmed. Berner petitioned for review, which we granted.

## II. DISCUSSION

A. Standard of Review

■

¶ 36. A motion to dismiss a claim based on insufficiency of the evidence adduced at trial may be granted when a court "is satisfied that, considering all credible evidence in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such a party." *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 388, 541 N.W.2d 753 (1995); *see also,* Wis. Stat. § 805.14(1). We have explained that we will "not overturn a circuit court's decision to dismiss for insufficient evidence unless the record reveals that the circuit court was 'clearly wrong.' " *Id.* at 389 (citing *Helmbrecht v. St. Paul Ins. Co.*, 122 Wis. 2d 94, 110, 362 N.W.2d 118 (1985)). We read the "clearly wrong" standard and the "no credible evidence" standard together, such that

---

[9] Berner does not contend that the set-offs were not properly made.

when a circuit court dismisses a claim that is supported by any credible evidence, its decision is "clearly wrong." *Id.*

¶ 37. We independently review whether there is sufficient evidence to submit a question on punitive damages to the jury. *Strenke v. Hogner,* 2005 WI 25, ¶ 13, 279 Wis. 2d 52, 694 N.W.2d 296.

B. Sufficiency of the Evidence

1. Breach of fiduciary duty

¶ 38. Berner claims that Krug had a fiduciary relationship with it because he was Berner's corporation counsel. Krug agrees with this contention. Berner also contends that Krug's conduct prior to Berner's settlement with Dairy Source, together with the amount it paid to Dairy Source for that settlement, is sufficient to establish that Krug breached his fiduciary duty to Berner resulting in damage to Berner.

¶ 39. Berner further contends that the settlement constitutes a business transaction between Krug and Berner and, as such, the transaction is presumed to be unlawfully tainted by Krug's undue influence. Moreover, Berner argues that because Krug engaged in a transaction with his client, Berner, it is *Krug's* burden to prove that the settlement was *not* the product of undue influence, rather than Berner's burden to prove that the settlement was the product of Krug's undue influence. Finally, Berner asserts that, because its settlement with Dairy Source was reached as a result of Krug's undue influence, it was harmed by the entire amount of the settlement, $1.35 million.

### a. Attorney-client "transaction"

¶ 40. The elements of a claim for breach of fiduciary duty are: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that duty; and (3) the breach of duty caused the plaintiff's damage. *Reget v. Paige*, 2001 WI App 73, ¶ 12, 242 Wis. 2d 278, 626 N.W.2d 302.

¶ 41. Wisconsin law has long recognized that attorneys owe a fiduciary duty of loyalty to their clients, *e.g., In re Law Examination of 1926,* 191 Wis. 359, 362, 210 N.W. 710 (1926). An attorney may breach that duty when he enters into a transaction with his client without fully informing the client of the risks that the transaction will potentially benefit the attorney and will potentially disadvantage the client. *See Zastrow v. Journal Commc'ns, Inc.,* 2006 WI 72, ¶ 30, 291 Wis. 2d 426, 718 N.W.2d 51. Indeed, we have promulgated a Supreme Court Rule forbidding lawyers licensed in Wisconsin from entering into business transactions with clients, unless they ensure the presence of certain safeguards.[10] SCR 20:1.8(a).

---

[10] SCR 20:1.8(a) identifies the following three safeguards:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

██

¶ 42. Berner is correct in asserting that the Restatement (Third) of the Law Governing Lawyers § 126 (2000) (Restatement § 126) presumes that transactions between attorneys and clients are tainted by undue influence. Berner is also correct in asserting that Restatement § 126 places the burden on an attorney who enters into a transaction with a client to show that he did not impose undue influence on the client.[11] However, we have not yet adopted Restatement § 126 as Wisconsin law. Furthermore, we do not need to decide whether to do so here because Berner has failed to prove that the settlement between Berner and Dairy Source constitutes a "transaction" between Krug and Berner.

¶ 43. The undisputed testimony is that Ed and Steve Kneubuehl personally met with Rose and Tony Steinmann and negotiated for the dismissal of all of Dairy Source's claims against Berner. The payment of $1.35 million to Dairy Source by Berner was agreed to at that meeting. The testimony shows that the Kneubuehls did not know how Krug's name came to be listed among those "released from claims" in the settlement document; they did not request it. Therefore, Berner did not bargain to pay Dairy Source $1.35 million for a release that included Krug. In sum, there is nothing in the record to demonstrate that Berner's settlement with Dairy Source for the payment of $1.35 million was

---

[11] Restatement (Third) of the Law Governing Lawyers § 126 (Restatement § 126) embodies a standard for legal malpractice. We need not consider here whether Restatement § 126 might also establish a standard for breach of fiduciary duty because, as explained more fully below, Berner failed to show that the settlement agreement constitutes a "transaction" between Berner and Krug.

271

a transaction between Berner and Krug. The settlement was a transaction between Berner and Dairy Source.

¶ 44. That the settlement was not an attorney-client transaction is even more apparent upon review of those occasions when we have evaluated actual transactions between attorneys and clients. For instance, in *In re Disciplinary Proceedings Against Peckham,* 2000 WI 17, 233 Wis. 2d 28, 606 N.W.2d 170, in the context of a disciplinary proceeding, we evaluated the conduct of Peckham, who accepted a loan from a client. *Id.* ¶¶ 7, 10. Peckham had appeared at a July 1997 pretrial conference short on cash and asked a client to loan him $500. *Id.*, ¶ 7. Peckham scribbled out a promissory note indicating he would return payment with 12 percent interest by September 5, 1997. *Id.*, ¶ 7. The client agreed to the terms. *Id.* Peckham received the money and his client provided that money. We affirmed that the loan constituted a business transaction between an attorney and a client. *Id.*, ¶ 10.

¶ 45. *Armstrong v. Morrow,* 166 Wis. 1, 163 N.W. 179 (1917), provides another example of an attorney engaging in a transaction with his client. There, an attorney, Morrow, represented a client, Phillips, in a matter in which Phillips had agreed to loan Oconto Brewing Company $10,900. *Id.* at 3. However, Phillips was $1,250 short of the full amount needed to complete his loan to Oconto Brewing. *Id.* Attorney Morrow contributed the $1,250 balance. *Id.* Oconto Brewing issued Phillips a mortgage to secure its debt. *Id.* Morrow and Phillips had a tacit understanding that Phillips would repay Morrow at Phillips' convenience. *Id.* However, they also agreed that Morrow would retain possession of the Oconto Brewing mortgage and promissory note until Phillips repaid the $1,250, with interest. *Id.*

¶ 46. Approximately a year and a half later, Morrow drafted an assignment of the Oconto Brewing mortgage to him. *Id.* Phillips signed the assignment, which Morrow recorded. *Id.* Morrow provided Phillips no additional consideration in return for the additional benefit he received from the assignment of the mortgage. *Id.*

¶ 47. We held that the assignment prepared by Morrow was presumptively invalid. *Id.* at 8. As we stated, it is "incumbent upon the attorney in a case like the one at bar to show affirmatively either that he paid an adequate consideration for the property, or that a gratuity was intended and that no advantage was taken of the confidential relations existing between the attorney and his client to obtain it." *Id.* at 7. *Armstrong* shows a giving up of an asset by the client and a taking of the asset by the attorney as evidence of their transaction.

¶ 48. Other cases from outside Wisconsin provide additional examples of attorney-client transactions. For example, *In re Smith,* 572 N.E.2d 1280, 1286 (Ind. 1991), the Indiana Supreme Court held that Smith had engaged in a transaction with a client, Mary Maxon, when the attorney made gifts to himself, his family, and employees of his law firm from the entrusted assets of an elderly, mentally incompetent client.[12] Once again,

---

[12] Smith had used nearly $17,000 of his client's assets to purchase office equipment, and he arranged for his law firm to repay the debt interest-free. *In re Smith,* 572 N.E.2d 1280, 1283 (Ind. 1991). Although he claimed that he informed the client, he acknowledged that he did not advise her to seek outside counsel regarding the matter because "she would not have followed that advice." *Id.* Smith also doled out large bonuses to employees of his law firm and large gifts to Mary Maxon's relatives from funds in her estate. *Id.* at 1283–84. The client was elderly,

the attorney-client transaction involved a giving up of an asset by the client and a taking of the asset by the attorney.

¶ 49. In *Duggan v. Gonsalves,* 838 N.E.2d 614 (Mass. App. Ct. 2005), the Appeals Court of Massachusetts held that Duggan engaged in a transaction with his client, when he purchased his client's house at foreclosure for substantially less than the appraised value, then rented the property back to the client for the equivalent of the mortgage payment. The attorney-client transaction was evidenced by the attorney benefiting himself at the expense of the client.

¶ 50. The cases reviewed above demonstrate that the Berner-Dairy Source settlement is patently different from transactions between attorneys and clients that courts have reviewed under claims that they were improper. In all the cases we have located where attorney-client transactions were involved, there was a communication or activity that reciprocally affected the client and the attorney. That is, one party gave up something and the other party received something at the expense of the one who relinquished it. Our understanding of a transaction is consistent with that set out in *Black's Law Dictionary,* which defines transaction as, "An agreement that is intended by the parties to prevent or end a dispute and in which they make reciprocal concessions." *Black's Law Dictionary* 1535 (8th ed. 2004).

¶ 51. In contrast, there is no evidence that the Berner-Dairy Source settlement embodies reciprocal activity affecting Berner and Krug. Krug was not in-

---

unable to care for herself and lived in a "confused state." *Id.* at 1285. Accordingly, the court concluded that if Smith in fact had consulted her regarding these transactions, she was incompetent to consent. *Id.*

volved in Berner's decision to pay Dairy Source in a settlement. That determination was made in a meeting between Berner and Dairy Source. Accordingly, Dairy Source, not Krug, is the party with whom Berner engaged in reciprocal activity. Berner paid Dairy Source $1.35 million dollars and in return received from Dairy Source its commitment not to "use, distribute or copy" Berner's proprietary information, including its recipes, pricing information, and formulas. In addition, the parties agreed to drop all claims against each other and to refrain from filing new suits against each other. Therefore, Berner gave up nothing to Krug when it agreed to pay Dairy Source $1.35 million as settlement. The settlement negotiation that resulted in the settlement was a transaction between Berner and Dairy Source, not between Berner and Krug.

¶ 52. Furthermore, Brennan, not Krug, represented Berner in the litigation with Dairy Source. Berner does not dispute that its attorneys at Brennan were engaged with Dairy Source representatives in drafting the settlement document. Moreover, the admissions by Ed and Cheryl Kneubuehl belie Berner's claim that, because the settlement document releases Krug from all claims, the settlement was the product of undue influence. When asked whether Krug had any input into the settlement amount, Ed Kneubuehl testified that Krug had not. Cheryl Kneubuehl also testified that she did not recall Krug having any input in the settlement.

¶ 53. Therefore, although the settlement document may have conferred a benefit on Krug, there is no evidence that releasing Krug came at a cost to Berner, and thereby affected the parties reciprocally. Furthermore, although it is possible that some finite value could be attributed to the release of Krug, Berner has

not presented any evidence to show what that value may be. For example, Berner has not presented any evidence that the cost of its settlement was increased due to Krug's release. Berner instead alleges that the full cost of the settlement agreement, $1.35 million, constitutes its damages for releasing Krug. No credible evidence supports Berner's claim in this regard.

¶ 54. Berner also has contended that it is entitled to a presumption that the settlement was the product of undue influence. The party seeking the benefit of a presumption carries the burden of establishing that presumption. *See Patterson v. Jensen,* 246 Wis. 319, 345–46, 17 N.W.2d 423 (1945). Because the settlement was not a transaction between Berner and Krug, Berner has failed in its proof that it is entitled to the presumption it seeks.[13] *See* Restatement § 126. Therefore, the burden remained with Berner to show that Krug's inclusion in the settlement was a breach of Krug's fiduciary duty that caused Berner damages.

b. Damages

¶ 55. In the absence of a breach of the fiduciary duty that an attorney owes to his client, there are, of course, no damages that can be caused by a breach of that duty. However, we discuss Berner's arguments with respect to damages to further explain how the evidence presented at trial falls short of what the law requires to maintain a claim for breach of fiduciary duty.

---

[13] We do not decide that, had Krug and Berner in fact engaged in a transaction, Berner would, in accordance with Restatement § 126, be entitled to the presumption that the transaction was the product of undue influence. We reserve the decision to adopt or not to adopt Restatement § 126 for another day.

¶ 56. Berner argues that it is entitled to a presumption that it was damaged by the entire settlement amount of $1.35 million. Berner supports this argument by asserting that Krug assured Berner that it would recover money from Dairy Source and that Krug advised Berner not to offer to settle if Dairy Source were to pay Berner $300,000. However, Dairy Source never offered to pay Berner one dollar to settle. It was Berner who was required to pay Dairy Source in order to settle the multiple suits between them. Therefore, this contention has no support in the facts, as well as none under the law. *See* ¶ 27, above.

¶ 57. Berner also argues that it incurred $1.35 million in damages because Krug "planned and oversaw" the entry into the Delavan offices. Berner's arguments are misplaced in regard to a breach of fiduciary duty claim, although those arguments were before the jury in regard to Berner's legal malpractice claim.[14] A breach of fiduciary duty does not arise simply because a lawyer gives poor, but well-meaning, legal advice. *Zastrow,* 291 Wis. 2d 426, ¶ 30; *see also Cmty. Nat'l Bank v. Med. Benefit Adm'rs,* 2001 WI App 98, ¶ 8, 242 Wis. 2d 626, 626 N.W.2d 340. It requires something more: the breach of the attorney's duty of loyalty to the client. *Zastrow,* 291 Wis. 2d 426, ¶ 30.

---

[14] It also appears that Berner is seeking double recovery for the consequences of using a "self-help" remedy to recover its property from Dairy Source's offices. Double recovery for a single wrong generally is not permitted under the common law. *Wickenhauser v. Lehtinen,,* 2007 WI 82, ¶ 20, 302 Wis. 2d 41, 734 N.W.2d 855; *Olstad v. Microsoft Corp.,* 2005 WI 121, ¶ 82, 284 Wis. 2d 224, 700 N.W.2d 139.

¶ 58. Furthermore, the law requires Berner to establish the magnitude of the damages it sustained as a result of Krug's alleged breach of fiduciary duty. *See, e.g., Reget,* 242 Wis. 2d 278, ¶ 12. Berner has proved neither that it incurred damages nor the magnitude of its damages in regard to its breach of fiduciary duty claim.

¶ 59. Berner retained an expert, Professor Rofes, who testified that Krug's conduct in representing Berner fell below the standard of care that Wisconsin law requires attorneys to exercise. But Professor Rofes expressed no opinion about whether the settlement amount was appropriate or whether Krug had caused Berner any damages. Furthermore, Berner presented no evidence to show that the settlement amount was greater than it otherwise would have been absent Krug's alleged breach of fiduciary duty. Accordingly, Berner has not satisfied its burden of proving it incurred damages as a result of any alleged breach of fiduciary duty by Krug.

¶ 60. In sum, as we have recounted and as two previous courts have concluded, the record is devoid of "credible evidence to sustain a finding" in favor of Berner on its claim for breach of fiduciary duty. Wis. Stat. § 805.14(1). Accordingly, the circuit court did not err when it dismissed this claim.

2. Punitive damages

¶ 61. Berner next contends that the circuit court erred by refusing to submit a punitive damages question to the jury.[15] Before discussing why the credible

---

[15] The court of appeals did not reach the question of whether Krug's conduct gave rise to punitive damages; instead,

evidence is insufficient to support a jury question on punitive damages, the parties ask us to resolve one preliminary issue: Which state law applies with respect to Berner's punitive damages claim? Krug contends that Illinois law should apply in this case. Illinois law precludes punitive damages in legal malpractice cases,[16] while Wisconsin law does not. We conclude that there is no need to answer this question because, even if we assume that Wisconsin law applies, the evidence adduced at trial is insufficient to support a claim for punitive damages.

¶ 62. Wisconsin Stat. § 895.043(3) regulates the availability of punitive damages. It provides: "The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." Berner does not argue that Krug acted maliciously; it argues only that Krug acted in intentional disregard for its rights.

¶ 63. The legislature enacted Wis. Stat. § 895.043(3) in 1995, thereby altering Wisconsin's common law standard for punitive damages. *Strenke,* 279 Wis. 2d 52, ¶ 19. In doing so, it heightened the state of mind required of a defendant from a "wanton, willful and reckless" disregard for rights of another to an "intentional disregard" for rights of another. *Id.*

¶ 64. A defendant acts with intentional disregard if he or she: (1) "acts with a purpose to cause the result

---

it concluded that because Berner did not collect compensatory damages as a result of its set-off, Berner could not collect punitive damages. *Berner Cheese Corp. v. Krug,* No. 2005AP1527, unpublished slip op., ¶ 29 (Wis. Ct. App. Dec. 5, 2006).

[16] 735 Ill. Comp. Stat. 5/2–1115.

or consequence," or (2) "is aware that the result or consequence is substantially certain to occur from the person's conduct." *Id.*, ¶ 36. Accordingly, in order to fall within Wis. Stat. § 895.043(3), a defendant's conduct must be (1) deliberate, (2) in actual disregard of the rights of another, and (3) "sufficiently aggravated to warrant punishment by punitive damages." *Id.*, ¶ 38. We explained in *Strenke* that under this heightened threshold for punitive damages, we "expect circuit courts to serve as gatekeepers before sending a question on punitive damages to the jury." *Id.*, ¶ 40.

¶ 65. Since the legislative change, we have decided two cases that considered whether a defendant's conduct warranted submitting a jury question on punitive damages under the heightened standard of Wis. Stat. § 895.043(3): *Strenke,* 279 Wis. 2d 52 and *Wischer v. Mitsubishi Heavy Industries America, Inc.,* 2005 WI 26, 279 Wis. 2d 4, 694 N.W.2d 320. We review the factual background of both cases, before we consider whether Krug's conduct warranted submitting a jury question on punitive damages under § 895.043(3).

¶ 66. In *Strenke,* we concluded that the plaintiff presented sufficient evidence to submit to a jury a question in regard to punitive damages. *Strenke,* 279 Wis. 2d 52, ¶ 58. *Strenke* arose in the context of a personal injury action, where the injury was caused by a drunk driver. *Id.*, ¶ 6. Hogner got behind the wheel of his vehicle and proceeded southbound down Highway 48, after consuming 16–18 beers in five hours. *Id.*, ¶ 8. Strenke was driving northbound on the same highway. *Id.*, ¶ 5. As Strenke approached an intersection, Hogner veered left into Strenke's path and the two collided, causing injury to Strenke. *Id.*, ¶ 5. During trial, Hogner admitted that he had four prior convictions for driving while intoxicated. *Id.*, ¶ 8.

¶ 67. We concluded that there was sufficient evidence from which a reasonable jury could find that Hogner's conduct was (1) deliberate, (2) in actual disregard for the plaintiff's rights and (3) sufficiently aggravated to warrant punishment by punitive damages. *Id.*, ¶¶ 55–57. First, Hogner's consumption of 16–18 beers in five hours and then driving while intoxicated was deliberate. *Id.*, ¶ 55. Second, Hogner's drunk driving disregarded Strenke's right to safely use the highway with other sober motorists. *Id.*, ¶ 56. Finally, Hogner's four previous convictions for driving while intoxicated and his consumption of 16–18 beers in five hours the evening of the collision with Strenke constituted sufficiently aggravated conduct to warrant punishment by punitive damages. *Id.*, ¶ 57.

¶ 68. Similarly, in *Wischer*, we concluded that the defendant's conduct was sufficiently aggravated that a jury could consider whether to award punitive damages. *Wischer*, 279 Wis. 2d 4, ¶ 8. *Wischer* also arose from personal injuries. *Id.* On a windy afternoon, three ironworkers, standing in a basket atop a crane, prepared to bolt into place a 913,000–pound, 120 by 76–foot panel of Miller Park's retractable roof. *Id.*, ¶ 14. The crane collapsed and the workers fell to their deaths. *Id.*, ¶ 12.

¶ 69. In concluding that a question on punitive damages could be submitted to the jury, the following facts were noted: (1) Users of the crane were issued a load chart that set out the crane's limitations in wind. *See id.*, ¶ 38. (2) The load chart stated that the crane could not be used safely in winds exceeding 20 mph, regardless of the load. *Id.*, ¶ 39. (3) Mitsubshi was aware that the maximum safe wind speed for the crane to conduct a lift was 20 mph and that a "tragedy could occur" if a lift was conducted during winds in excess of

20 mph. *Id.*, ¶¶ 40, 42. (4) Various witnesses placed the wind speed during the afternoon of the accident as being between 20–32 mph. *Id.*, ¶ 48. (5) At the time of the lift, Mitsubishi was aware of winds that exceeded the 20 mph maximum wind velocity for a safe lift. *Id.*, ¶¶ 74–75 (Roggensack, J., concurring). (6) Notwithstanding Mitsubishi's awareness of the conditions then present, the lift proceeded, even though Mitsubishi was aware that performing the lift could imperil the ironworkers' right to personal safety. *Id.*, ¶ 8.

¶ 70. The basis for Berner's contention that it provided sufficient evidence to submit a punitive damages question to a jury is distinguishable from *Strenke* and *Wischer.* For example, unlike Mitsubishi's awareness that "tragedy could occur" through a crane lift when the wind speeds exceeded 20 mph and that the winds were then in excess of 20 mph, no credible evidence was presented to show that Krug was aware that Berner's rights would be disregarded as a result of his legal advice. To the contrary, the evidence demonstrates that Krug believed that Berner's entry into the Delavan offices was lawful.

¶ 71. In addition, the evidence shows that, by attempting to mitigate the risks attending the entry into the Delavan offices, Krug took steps to ensure that he *preserved* Berner's property rights: he advised Berner (1) not to enter at night; (2) not to remove anything that was Dairy Source's property; (3) to stay away from Dairy Source's computers; (4) to apprise local law enforcement in advance that it planned to enter the Delavan offices; and (5) to hire Brennan to seek any of Berner's property that remained in Delavan in a replevin action.

282

¶ 72. Berner contends that Krug's inclusion among those released by the settlement document warrants submission of a punitive damages question to the jury. To be sure, by March 2000, Krug had become concerned that Berner could come out the loser in its many lawsuits against Dairy Source. He did ask Berner to indemnify him and the settlement document lists Krug among those who are released by Dairy Source. However, Berner has not presented any evidence to prove that its rights were disregarded by Dairy Source's release of Krug. Stated otherwise, Berner elicited no evidence providing a causal link between Krug's release and Berner's payment of $1.35 million to settle with Dairy Source. Accordingly, no credible evidence indicates that Krug was aware that his conduct was substantially certain to result in Berner's rights being disregarded. *See Strenke,* 279 Wis. 2d 52, ¶ 36; *Wischer,* 279 Wis. 2d 4, ¶ 8. The circuit court correctly concluded that the evidence adduced at trial was insufficient to submit a question on punitive damages to the jury.

## III. CONCLUSION

¶ 73. In sum, we were asked to resolve two issues: (1) whether Berner presented credible evidence to maintain its claim for breach of fiduciary duty; and (2) whether Berner presented credible evidence to submit a punitive damages question to the jury. We answer both inquiries in the negative and affirm the court of appeals, albeit on different grounds.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 74. ANN WALSH BRADLEY, J. (*concurring*). I agree with the majority that there was insufficient

evidence to present a punitive damages question to the jury. I also agree that the circuit court did not err in dismissing Berner's breach of fiduciary duty claim. Unlike the majority, however, the circuit court based its determination on an insufficiency of evidence and not on the majority's erroneous interpretation of what constitutes a transaction.

¶ 75. I write separately because the majority narrows the attorney discipline rule that serves as a basis for its opinion. In interpreting SCR 20:1.8(a) (Conflict of interest: prohibited transactions), the majority (1) sub silencio alters the text of SCR 20:1.8(a); (2) adds a requirement that transactions involve reciprocal activity; and (3) ignores other language set forth in the rule. I am particularly concerned because the majority's narrowing of the rule here has implications for future lawyer discipline cases.

I

¶ 76. The majority determines that Krug did not breach his fiduciary duty to Berner. It reaches that conclusion by reasoning that the transaction (the settlement agreement) was between Berner and Dairy Source and not between Berner and Krug. It next concludes that there is no evidence that the settlement "embodies reciprocal activity affecting Berner and Krug." *Id.*, ¶ 51.

¶ 77. The analysis of the majority goes off track in its discussion of the transaction when it alters the text of SCR 20:1.8(a) that serves as a foundation for its opinion. It fails to quote the actual text of the rule, which provides as follows: "A lawyer shall not enter into a business transaction *with* a client or knowingly ac-

quire an ownership, possessory, security or other pecuniary interest adverse to a client . . . ." SCR 20:1:8(a) (emphasis added).

¶ 78. Failing to quote the actual text allows the majority to alter the language of the rule. Although it initially states that there may be a breach of fiduciary duty when an attorney "enters into a transaction *with* his client," majority op., ¶ 41 (emphasis added), its analysis and conclusions regarding the rule concern only whether the settlement agreement was a "transaction *between* Berner and Krug." *Id.*, ¶ 43 (emphasis added).[1]

- ¶ 42: "Berner has failed to prove that the settlement between Berner and Dairy Source constitutes a 'transaction' *between* Krug and Berner."

- ¶ 43: "In sum, there is nothing in the record to demonstrate that Berner's settlement with Dairy Source . . . was a transaction *between* Berner and Krug."

- ¶ 44: "That the settlement was not an attorney-client transaction is even more apparent upon review of those occasions when we have evaluated actual transactions *between* attorneys and clients."

- ¶ 50: "[T]he Berner-Dairy Source settlement is patently different from transactions *between* attorneys and clients . . . ."

---

[1] The majority also uses four cases to support its use of "between": *In re Disciplinary Proceedings Against Peckham*, 2000 WI 17, 233 Wis. 2d 28, 606 N.W.2d 170; *Armstrong v. Morrow*, 166 Wis. 1, 163 N.W. 179 (1917); *In re Smith*, 572 N.E.2d 1280 (Ind. 1991); and *Duggan v. Gonsalves*, 838 N.E.2d 614 (Mass. App. Ct. 2005). However, not one of the cases uses "between." Consistent with the text of SCR 20:1.8(a), they all use the word "with."

- ¶ 51: "The settlement negotiation that resulted in the settlement was a transaction *between* Berner and Dairy Source, not *between* Berner and Krug."

- ¶ 54: "[T]he settlement was not a transaction *between* Berner and Krug . . . ."

(Emphasis added.)

¶ 79. Krug appears to have entered a transaction, which was also entered by Berner. Both Krug and Berner signed the settlement agreement. Although the settlement agreement was not *between* Krug and Berner, Krug entered the transaction *with* Berner. In effect, the majority sub silencio alters the text of this attorney discipline rule and appears to limit the prohibition to only those situations where the transaction is between the attorney and client.

¶ 80. The significance of the majority's misstep is that it narrows the application of SCR 20:1.8(a). The word "between" means that two parties are involved whereas the word "with" encompasses an unlimited number of parties.

¶ 81. By altering the text of the rule, the majority appears to apply this conflicts of interest prohibition only to situations where there is a transaction between a lawyer and a client. The result of such a narrow application is that it may leave clients unprotected and lawyers unregulated in situations where multiple parties are involved and actual conflicts of interest exist.

## II

¶ 82. Additionally, the majority narrows SCR 20:1.8(a) by adding a new requirement. It maintains that for an attorney to enter a transaction with a client,

there must be "reciprocal activity," majority op., ¶ 51, and some "giving up of an asset by the client and a taking of the asset by the attorney." *Id.*, ¶ 48. Certainly such cases constitute transactions. However, as the majority notes, this court in *Armstrong v. Morrow* stated that it is "incumbent upon the attorney . . . to show affirmatively either that he paid an adequate consideration for the property, or that a *gratuity* was intended and that no advantage was taken of the confidential relations existing between the attorney and his client to obtain it." 166 Wis. 1, 163 N.W. 179 (1917) (emphasis added); majority op., ¶ 47. A gratuity may involve giving without getting something in return.

¶ 83. The majority recognizes that the settlement agreement was a transaction. Majority op., ¶ 47. However, it fails to acknowledge that it is also a transaction from which Krug received a substantial benefit: indemnification. The benefit is one that Krug pursued. He indicated to the Kneubuehls that he would seek indemnification, even going so far as to prepare a legal memorandum arguing that Berner should indemnify him.

¶ 84. The majority maintains that "Berner gave up nothing to Krug when it agreed to pay Dairy Source $1.35 million as settlement." Majority op., ¶ 51. Even if that is true, it is not dispositive.

¶ 85. What matters is that Berner lost an opportunity to pay less to Dairy Source because Krug's indemnification was in the settlement agreement. Krug benefited, but did not give anything in exchange—it was in essence a gratuity from Berner to Krug. Because Berner did not know how Krug's indemnification came to be included in the agreement, *id.*, ¶ 28, there is no reason to think the gratuity was intended.

### III

¶ 86. Another way in which the majority narrows the rule is by failing to address all of the language in SCR 20:1.8(a). The rule does not refer only to transactions. Rather, it also requires precautions when attorneys "knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client." By seeking and receiving indemnification, Krug knowingly acquired a pecuniary interest in the settlement agreement. That interest is adverse to Berner.

¶ 87. Berner requested that Krug pay $200,000 toward the settlement, although Krug refused to do so. More importantly, the agreement to indemnify Krug must have been worth something to Dairy Source, such that Berner had to pay more for the settlement by including Krug. Otherwise, Dairy Source agreed to the indemnification gratuitously—a "free lunch" for Berner and Krug. No such thing.

### IV

¶ 88. I am particularly concerned about the repercussions of the majority's narrowing of the rule. The supreme court rule used by the majority is not confined to cases involving breach of fiduciary duty. Rather the rule applied by the majority today is part of the Code of Professional Responsibility. The Code serves as the guidepost of our lawyer disciplinary system. By narrowing the scope of the rule, the majority concurrently limits the responsibility of lawyers and narrows the protection afforded to clients.

¶ 89. The rule also serves as a guide for lawyer self-regulation. Does the majority opinion signal that it is proper for lawyers to enter transactions with clients, so long as the transaction is not between the lawyer and client? Does the majority opinion indicate that gratuity

given by clients to lawyers are beyond the scope of lawyer regulation because there is no "reciprocal activity"? Is it now the case that lawyers may knowingly acquire pecuniary interests adverse to their clients so long as there is no transaction?

## V

¶ 90. I believe that the settlement agreement was a transaction that Krug entered with Berner, even though it was not a transaction between Krug and Berner. The indemnification was a gratuity that was apparently unintended, and the fact that there was no reciprocal activity is irrelevant. By receiving indemnification, Krug received a pecuniary interest adverse to Berner, his client. Thus, because Krug took none of the precautions outlined in SCR 20:1.8(a),[2] Berner's breach of fiduciary duty claim should not have been dismissed on the ground that there was no breach.[3]

---

[2] Those safeguards are:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

SCR 20:1.8(a).

[3] Berner argues that Krug's transaction with Berner gives rise to a presumption of undue influence in the transaction, and that Krug has failed to prove that the transaction was not the product of undue influence. Even if Berner is correct about this

¶ 91. Although I disagree with the majority regarding whether there was a breach of fiduciary duty in this case, I agree that the circuit court did not err in dismissing the breach of fiduciary duty claim. The circuit court dismissed the claim on the ground that Berner failed to produce sufficient evidence that it had paid more for the settlement because of the breach. The court of appeals affirmed the dismissal on the ground that Berner presented no credible evidence that it was harmed. *Berner Cheese Corp. v. Krug,* No. 2005AP1527, unpublished slip op., ¶ 23 (Wis. Ct. App. Dec. 5, 2006).

¶ 92. The majority purports to follow the same course, setting forth a standard of review based on sufficiency of evidence. Majority op., ¶ 36. However, it does not stick with that standard. Instead it reviews the legal question of what constitutes a transaction in a breach of fiduciary duty cause of action. *Id.*, ¶¶ 40–50.

¶ 93. I would stick to a review of the question presented by the decisions of the circuit court and court of appeals in this regard. The circuit court determined that Berner has not provided evidence that it paid more for the settlement to include indemnification for Krug. Applying the correct standard of review I conclude that the circuit court's determination of insufficient evidence of damages is not clearly erroneous. *See Weiss v. United Fire and Cas. Co.,* 197 Wis. 2d 365, 388, 541 N.W.2d 753 (1995).[4] I therefore respectfully concur.

_____

presumption, it does not demonstrate that the attorney has the burden of showing that the client suffered no damages as a result of the breach of fiduciary duty and undue influence. Thus, while I agree that there was a breach, Berner has not proven that it can proceed before providing evidence that the breach caused damages.

[4] The elements for a claim of breach of fiduciary duty are: (1) the defendant had a fiduciary duty; (2) the defendant

¶ 94. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice LOUIS B. BUTLER, JR. join this concurrence.

breached that duty; and (3) the breach of duty caused injury to the plaintiff. *Reget v. Paige*, 2001 WI App 73, ¶ 12, 242 Wis. 2d 278, 626 N.W.2d 302. Rather than addressing the second element, as the majority does, I would decide the case based on the third element alone.